ACCEPTED
08-24-00004-CR
EIGHTH COURT OF APPEALS
EL PASO, TEXAS
10/28/2024 5:31 PM
ELIZABETH G. FLORES
CLERK

**08-24-00004-CR**

**IN THE
COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS**

FILED IN
8th COURT OF APPEALS
EL PASO, TEXAS

10/28/2024 5:31:18 PM

ELIZABETH G. FLORES
Clerk

**JOSEPH ANGEL ALVAREZ**                                        **APPELLANT**

**V.**

**THE STATE OF TEXAS**                                              **APPELLEE**

**THE STATE'S BRIEF**

**ON APPEAL FROM CAUSE NUMBER 20210D02640
IN THE 210th JUDICIAL DISTRICT COURT
OF EL PASO COUNTY, TEXAS**

**BILL D. HICKS
DISTRICT ATTORNEY
34th JUDICIAL DISTRICT**

**RAQUEL LOPEZ
ASST. DISTRICT ATTORNEY
DISTRICT ATTORNEY'S OFFICE
201 EL PASO COUNTY COURTHOUSE
500 E. SAN ANTONIO
EL PASO, TEXAS 79901
(915) 546-2059 ext. 3070
FAX (915) 533-5520
ra.lopez@epcounty.com
SBN 24092721**

**ATTORNEYS FOR THE STATE**

**The State does not request oral argument.**

# TABLE OF CONTENTS

INDEX OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi-x

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xi

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-3

SUMMARY OF THE STATE'S ARGUMENTS. . . . . . . . . . . . . . . . . . . . . . . . . 4-6

ARGUMENT AND AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-72

**THE STATE'S REPLY TO ALVAREZ'S FIRST, SECOND, THIRD, AND FOURTH ISSUES:**
**Alvarez lacks standing to challenge the geofence-warrant because it did not implicate a "search" under the Fourth Amendment. Alternatively, the geofence-warrant, authorizing the search of Google's Sensorvault (*not* Alvarez or others) and seizure of only location-history data supported by probable cause narrowly tailored to the specific facts of the case, was neither unconstitutionally overbroad, unparticularized, nor "general" (Issue One).**

**The subsequently obtained Gmail-, social-media-, house/cell-phone-search-warrants were (or conceded to be) supported by sufficiently particularized probable cause. Moreover, Article 38.23(b)'s good-faith exception applies to bar suppression of the subsequently obtained evidence (Issues Two, Three, and Four).** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-51

**I.     Underlying facts** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-14

**II.    Standard-of-review and general-applicable law on search-warrants** 14-16

**III.   The geofence-warrant, which Alvarez lacks standing to challenge, was neither constitutionally overbroad, unparticularized, nor impermissibly "general"(Issue One).** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16-36

      **A.     The geofence-warrant-search did not implicate Alvarez's constitutionally protected privacy interest.** . . . . . . . . . . . . . . . . 17-22

**B.** **Det. Garcia's affidavit contained a substantial basis to support the geofence-warrant-issuing-judge's probable-cause-determination.**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22-28

**C.** **The geofence-warrant, narrowly tailored to a specific, probable-case-supported time and place, was neither constitutionally overbroad nor unparticularized..** . . . . . . . . . . . . . . . . . . . . . . 28-36

    1. Particularity: alleged "unbridled discretion" . . . . . . . . . . . . . . 28-31

    2. Alleged "general exploratory search" . . . . . . . . . . . . . . . . . . . 32-36

**IV.** **The subsequently obtained Gmail-, social-media-, and house/cell-phone-search-warrants were (or conceded to be) supported by sufficiently particularized probable cause. Moreover, under Article 38.23(b)'s good-faith exception, Alvarez was not entitled to suppression of the geofence-warrant's evidentiary fruits (Issues Two, Three, and Four).** . . . . . 36-51

**A.** **Underlying facts** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36-39

**B.** **The Gmail-and social-media-search-warrants are supported by sufficiently particularized probable cause (Issues Two and Three).** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39-43

**C.** **Alvarez fails to show reversible trial-court error in denying suppression of the house/cell-phone-search-warrant's evidentiary fruits. (Issue Four).** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43-47

    1.    Underlying Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43-44

    2.    Alvarez waived his insufficient-probable-cause claim as to the house-search portion of the warrant. . . . . . . . . . . . . . . . . 44-45

    3.    Any error in the trial court's refusal to suppress the cell-phone "dump" evidence was harmless. . . . . . . . . . . . . . . . . . . . . 45-47

    D.     Article 38.23(b)'s good-faith exception applies to preclude suppression of the subsequent search-warrants' evidentiary fruits (Issues Two, Three, and Four). . . . . . . . . . . . . . . . . . . . . . . . . . 47-51

**THE STATE'S REPLY TO ALVAREZ'S FIFTH ISSUE**:
**Where the jury was presented with evidence that Alvarez believed his conduct to be illegal merely under "man's law" and that he thus undertook various efforts to avoid detection, viewing the evidence in a neutral light and affording due deference to the jury's weight-and-credibility determinations, despite the evidence of Alvarez's mental disease, the jury's rejection of Alvarez's insanity defense was not so against the great weight of the evidence as to be manifestly unjust.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52-66

**I.     Underlying facts** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52-58

**II.    Standard-of-review and general applicable law on insanity** . . . . . . . 59-61

**III.   The jury had factually sufficient evidence to reject Alvarez's insanity defense.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61-66

**THE STATE'S REPLY TO ALVAREZ' SIXTH ISSUE**:
**Where Alvarez, having failed to review in its entirety the complained-of video-exhibit, failed to identify for the trial court the video's allegedly objectionable portions, he has failed to preserve for review, or demonstrate the requisite harm warranting reversal for, any evidentiary-ruling complaint**. . . . . . . . 67-72

**I.     Underlying facts** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67-68

**II.    Standard-of-review** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68-69

**III.   Alvarez waived his evidentiary-ruling complaint.** . . . . . . . . . . . . . . 69-70

**IV.   Error, if any, was harmless.** . . . . . . . . . . . . . . . . . . . . . . . . . . . 70-72

PRAYER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

SIGNATURES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72-73

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

# INDEX OF AUTHORITIES

## FEDERAL CASES

*Carpenter v. United States*, 585 U.S. 296 (2018) . . . . . . . . . . . . . . . . . . . 18, 20, 26

*Dalia v. United States*, 441 U.S. 238 (1979) . . . . . . . . . . . . . . . . . . . . . . . . 30

*Florida v. Jardines*, 569 U.S. 1 (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*In re Search of Info. Stored at Premises Controlled by Google (D.C.)*, 579 F.Supp.3d 62 (D.D.C. 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 34, 35, 41

*In re Search Warrant Application for Geofence Location Data Stored at Google Concerning an Arson Investigation (Arson)*, 497 F.Supp.3d 345 (N.D. Ill. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 34, 35, 41

*In re Warrant Application for Use of Canvassing Cell-Site Simulator*, 654 F.Supp.3d 694 (N.D. Ill. 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Katz v. United States*, 389 U.S. 347 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Kyllo v. United States*, 533 U.S. 27 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Leaders of a Beautiful Struggle v. Balt. Police Dep't.*, 2 F.4th 330 (4th Cir. 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Smith v. Maryland*, 442 U.S. 735 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Bowers*, CR 18-292, 2021 WL 2843173 (W.D. Pa. July 8, 2021) 42

*United States v. Chatrie (Chatrie I)*, 590 F.Supp.3d 901 (E.D. Va. 2022) . . . 18, 19

*United States v. Chatrie (Chatrie II)*, 107 F.4th 319 (4th Cir. 2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19, 20, 21, 35

*United States v. Davis*, 109 F.4th 1320, 1337 (4th Cir. 2024) . . . . . . . . . . . . . . 11

*United States v. James*, 3 F.4th 1102 (8th Cir. 2021) . . . . . . . . . . . . . . . . . . . 24, 26

*United States v. Knotts*, 460 U.S. 276 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Leon*, 468 U.S. 897 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*United States v. Maynard,* 615 F.3d 544 (D.D.C. 2010) . . . . . . . . . . . . . . . . . 20

*United States v. Rhine*, 652 F.Supp.3d 38 (D.D.C. 2023) . . . . . . . . . . . . . . 31, 33

*United States v. Richards*, 659 F.3d 527 (6th Cir. 2011) . . . . . . . . . . . . . . . . . 41

*United States v. Smith*, 110 F.4th 817 (5th Cir. 2024) . . . . . . . . . . . . . . . . . 11, 49

*Ybarra v. Illinois*, 444 U.S. 85 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 39

## STATE CASES

### (TEXAS)

*Bagheri v. State*, 119 S.W.3d 755 (Tex.Crim.App. 2003) . . . . . . . . . . . . . . . . . 70

*Baldwin v. State*, 664 S.W.3d 122 (Tex.Crim.App. 2022) . . . . . . . . . . . . . . . . . 27

*Bartel v. State*, No. 02-16-00020-CR, 2017 WL 1089689 (Tex.App.–Ft. Worth Mar. 23, 2017, no pet.)(mem.op., not designated for publication) . . . . . . . . . . . . . 65

*Bigby v. State*, 892 S.W.2d 864 (Tex.Crim.App. 1994), *overruled in part on other grounds by Tennard v. Dretke*, 542 U.S. 274 (2004) . . . . . . . . . . . . . . . . . . . . . . . 60

*Bonds v. State*, 403 S.W.3d 867 (Tex.Crim.App. 2013) . . . . . . . . . . . . . . . . . . . 31

*Bowden v. State*, No. 08-19-00057-CR, 2021 WL 3661163 (Tex.App.–El Paso Aug. 18, 2021, pet. ref'd)(not designated for publication) . . . . . . . . . . . . . . . . . . . . . 42

*Campbell v. State*, No. 08-10-00298-CR, 2011 WL 3198873 (Tex.App.–El Paso July 27, 2011, no pet.)(not designated for publication) . . . . . . . . . . . . . . . . . 46, 69

*Dashield v. State*, 110 S.W.3d 111 (Tex.App.–Houston [1st Dist.] 2003, pet. ref'd) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60, 61

*Estrada v. State,* 313 S.W.3d 274 (Tex. Crim. App. 2010). . . . . . . . . . . . . . . . 47

*Farek v. State*, No. 01-18-00385-CR, 2019 WL 2588106 (Tex.App.–Houston [1st Dist.] June 25, 2019, pet. ref'd)(mem.op., not designated for publication) . . . 41, 42

*Ford v. State*, 158 S.W.3d 488 (Tex.Crim.App. 2005) . . . . . . . . . . . . . . . . . . . . 17

*Foreman v. State*, 613 S.W.3d 160 (Tex.Crim.App. 2020). . . . . . . . . . . . . . . . . 26

*Graham v. State*, 566 S.W.2d 941 (Tex.Crim.App. 1978) . . . . . . . . . . . . . . . 60, 61

*Johnson v. State*, 682 S.W.3d 638 (Tex.App.–Tyler 2024, pet. ref'd). . . . . . . . . 40

*Martinez v. State*, No. 05-18-01107-CR, 2020 WL 913857 (Tex.App–Dallas Feb. 26, 2020, pet. ref'd)(mem.op., not designated for publication) . . . . . . . . . . . . 71, 72

*McClintock v. State*, 541 S.W.3d 63 (Tex.Crim.App. 2017). . . . . . . . . . . 47, 48, 50

*McDonald v. State*, 676 S.W.3d 204 (Tex.App.–Houston [14th Dist.] 2023, pet. ref'd) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Morrow v. State*, 486 S.W.3d 139 (Tex.App.–Texarkana 2016, pet. ref'd). . . . . . 65

*Pena v. State*, No. 08-16-00236-CR, 2019 WL 1374152 (Tex.App.–El Paso Mar. 27, 2019, pet. ref'd)(op. reh'g)(not designated for publication). . . . . . . . . . . . . . 44

*Pillow v. State*, No. 13-20-00507-CR, 2022 WL 4102786 (Tex.App.–Corpus Christi-Edingubrg Sept. 8, 2022, no pet.)(mem.op., not designated for publication) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

*Powell v. State*, 63 S.W.435 (Tex.Crim.App. 2001) . . . . . . . . . . . . . . . . . . . . . . 68

*Rodriguez v. State*, 232 S.W.3d 55 (Tex.Crim.App. 2007) . . . . . . . . . . . . . . . . . 16

*Romero v. State*, 800 S.W.2d 539 (Tex.Crim.App. 1990). . . . . . . . . . . . . . . . . . . 21

*Ross v. State*, 154 S.W.3d 804 (Tex.App.–Houston [14th Dist.] 2004, pet. ref'd) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69, 70

*Ruffin v. State*, 270 S.W.3d 586 (Tex.Crim.App. 2008) . . . . . . . . . . . 59, 60, 64, 65

*Sims v. State*, 569 S.W.3d 634 (Tex.Crim.App. 2019) . . . . . . . . . . . . . . . . . . . . . 20

*State v. Granville*, 423 S.W.3d 399 (Tex.Crim.App. 2014) . . . . . . . . . . . . . . . . . 17

*State v. Henry*, 25 S.W3d 260 (Tex.App.-San Antonio 2000, no pet.) . . . . . . . . . 45

*State v. McLain*, 337 S.W.3d 268 (Tex.Crim.App. 2011). . . . . . . . . . . . . . . . . . . 15

*Templeton v. State*, No. 08-16-00018-CR, 2019 WL 1785476 (Tex.App.–El Paso Apr. 24, 2019, pet. ref'd)(not designated for publication). . . . . . . . . . . . . . . . . . . 59

*Villanueva v. State*, No. 01-20-00303-CR, 2021 WL 2832974 (Tex.App.–Houston [1st Dist.] July 8, 2021, no pet.)(mem. op., not designated for publication) 59, 60, 61

*Wells v. State*, 675 S.W.3d 814 (Tex.App.–Dallas 2023, pet. granted) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 26, 28, 31, 49

### (OTHER JURISDICTIONS)

*People v. Meza*, 312 Cal.Rptr.3d 1 (Cal.App. 2 Dist. 2023) . . . . . . . . . . . . . . . . . 49

*Price v. Super. Ct. of Riverside Cnty.*, 310 Cal.Rptr.3d 520 (Cal.App. 4 Dist. 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 31, 33, 35, 36

*State v. Contreras-Sanchez*, 5 N.W.3d 151 (Minn.Ct.App. 2024), *review granted* (May 29, 2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 34, 40

*State v. Shields*, No. 23 CAA 08 0048, 2024 WL 3028251 (Ohio Ct.App. June 17, 2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Tomanek v. State*, 261 Md.App. 694 (Md.App. 2024) . . . . . . . . . . . . . . . 26, 27, 49

**STATE STATUTES and RULES**

TEX.R.APP.P. 33.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

TEX.R.APP.P. 38.1(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

TEX.R.APP.P. 44.2(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

## STATEMENT OF THE CASE

Appellant, Joseph Angel Alvarez ("Alvarez"), was indicted for the murder of Georgette Kaufmann (Count I) and the aggravated assault of her husband, Daniel Kaufmann (Count II). (CR:9-10).[1] Rejecting his insanity defense, the jury found Alvarez guilty of both counts. (CR:484-85).

After receiving punishment evidence, the jury assessed punishment for Counts I and II at imprisonment for a term of life and twenty years, respectively, and no fine. (CR:496, 498). The trial court sentenced Alvarez in accordance with the jury's verdicts. (CR:470-75 ); (RR19:56-57). Following a timely filed motion for new trial, Alvarez timely filed notice of appeal. (CR:682, 770).

---

[1]  Throughout this brief, references to the record will be made as follows: references to the one-volume clerk's record will be made as "CR" and page number; references to the reporter's record will be made as "RR" and volume and page number; and references to exhibits will be made as either "SX" or "DX" and exhibit and page number, where applicable.

## STATEMENT OF FACTS

Viewed in the light most favorable to the jury's verdicts, the record and evidence admitted at trial show the following:[2]

This case arises out of the disturbing events of November 14, 2020, when local attorneys Georgette and Daniel Kaufmann ("Georgette" and "Daniel") were gunned down in their home in El Paso's Manhattan Heights Historic District. (RR13:55-56);(RR15:89). Claiming El Paso Memorial Park marked a hotbed of satanic, baby-and-aborted-fetus sacrificial offerings, the gunman (later identified as Alvarez) maintained he was ordained by God to execute the occupants of the Kaufmann residence (situated on the edge of Memorial Park) because they were "generationally cursed" satanic abortionists. (RR14:104-05) *See, e.g.*, (RR15:84-86,93-96,145-47,161,165,170-72,206).

Just prior to the shootings, Daniel had been home awaiting Georgette's arrival from one of her usual weekend visits with her mother. (RR13:58). The previous day had marked their 22-year wedding anniversary, and the two planned to celebrate together that evening. (RR13:58). The Kaufmanns' only child, then just five days shy of his seventeenth birthday, was out of town competing in a fencing tournament. (RR13:56-57). Wanting to enjoy the evening breeze, Daniel left the inner-door to

---

[2] The State sets out additional relevant factual background in each of its replies.

-1-

the back-porch open, but kept the wrought-iron screen-door locked. (RR13:60-62);(SX21,41).

At some point, Daniel heard what sounded like the jiggling of the screen-door's handle. (RR13:60-61). Thinking it was Georgette who was attempting to open the door, Daniel walked down the hallway to unlock it and let her in. (RR13:61). When he did not see her, he peered through the screen-door to see if she was there, at which point, Daniel saw a large figure walking down the porch steps, toward the detached garage. (RR13:61-62). As soon as Daniel grabbed the screen-door handle, the figure turned right back around, walked back up the porch steps, and stood in front of the screen-door. (RR13:61-62, 67). Not recognizing who it was, Daniel took a few steps back from the (still-locked) screen-door, at which point, he saw the unknown intruder—clad in dark clothes and a hoodie pulled tightly around his face—raise a gun in his hand. (RR13:61,67,78-79).

When blood started running down his head, Daniel realized he had been shot and feared "[t]his [wa]s how [he was] going to die." (RR13:67-68). The gunman shot a total of six rounds through the screen-door, inflicting three gunshot wounds to Daniel's head, hand, and back shoulder. (RR13:69-70). After his initial shock, Daniel first took cover in the master bedroom but soon realized he would be killed if the shooter managed to make it into the house; and so, he ran as fast as he could

through the house, out the front door, and across the street to his neighbor's house. (RR13:68,70-71,73,75);(SX74-76). When his neighbor answered his frantic knocks at the door, Daniel asked him to call 911 and told him to call Georgette to tell her not to come home. (RR13:75).

Daniel would later learn that by the time he had been shot, the gunman had already ambushed and killed Georgette as she arrived home. (RR13:111,135-36);(RR15:170-72);(SX23-27). When police responded to the scene, they discovered Georgette's body lying in the garage, next to her vehicle. (RR13:111, 135-36); (SX23-25). She suffered a total of five gunshot wounds at close range, including two to her face and chin. (SX81-84, SX88: p.2,8).

Several months after the shootings, despite exhausting all manner of investigative techniques, investigators had not a single witness, suspect, or lead in the case. (RR14:35-46). Eventually, through the use of a new investigative tool called a "geofence" warrant, police were able to identify Alvarez as the perpetrator. (RR14:46,90-91,104,107-108).

At trial, rather than dispute his commission of the crimes, Alvarez contended a severe mental illness rendered him legally insane. (RR13:43-47). They jury rejected his insanity defense and found him guilty of the murder of Georgette and the aggravated assault of Daniel. (CR:484-85,496-98).

## SUMMARY OF THE STATE'S ARGUMENTS

**Replies to Issues One through Four (the geofence-, Gmail, social-media, and house/cell-phone-search-warrants):**

In his first issue, Alvarez complains of trial-court error in failing to suppress the fruits of the geofence-search-warrant through which police linked him to the crimes, contending the geofence-warrant lacked sufficient probable cause and was impermissibly overbroad, unparticularized, and "generally exploratory." But Alvarez failed to establish a reasonable expectation of privacy in the limited historical-location data seized. And even if he had standing, Alvarez's overbreadth and lack-of-particularized-probable-cause claims fail because under a proper application of the probable-cause standard, the geofence-warrant was sufficiently narrowly tailored to a specific, probable-case-supported time and place. Neither did Google's incidental search of its entire Sensorvault render the geofence-warrant impermissibly "general" or "exploratory," as police properly exercised their discretion to identify and access only the data encompassed with the warrant's narrowly tailored authorized search.

Alvarez's claims in Issues Two, Three, and Four challenging the validity of various subsequently obtained warrants for the search of his Gmail and social-media accounts, his home, and his cell-phone are flawed in similar respects. Further,

because he specifically conceded to the sufficiency of the probable cause supporting the house's search, he waived any complaint thereto. Moreover, given the dearth of caselaw on the legality of the challenged investigative tool (and the lack of binding precedent even to this day), Article 38.23(b)'s good-faith exception applies to preclude suppression of the evidentiary fruits of the subsequent search-warrants. And finally, admission of substantively similar evidence without objection rendered harmless any error in failing to suppress the evidence seized through the challenged cell-phone "dump."

**Reply to Issue Five (jury's rejection of insanity defense):**

In his fifth issue, Alvarez complains that the jury's rejection of his insanity defense rested on factually insufficient evidence. However, Alvarez failed to prove his affirmative defense as a matter of law where the jury was presented with ample evidence that, whatever the delusions that supplied the motive for the shootings, Alvarez had a clear understanding that, despite his opinions on his moral justification for committing his crimes, society considered his conduct wrong under the law.

**Reply to Issue Six (admission of walk-though video):**

In his sixth issue, Alvarez complains of the trial court's admission of a video-exhibit of police's post-arrest "walk-through" of his residence. But where Alvarez,

having failed to review the video in its entirety, failed to apprise the trial court of the video's purportedly inadmissible portions, he waived his complaint. Additionally, any error in the video's admission was harmless where the State's case was strong, and the video, un-emphasized by the State, supported Alvarez's defensive theory.

## THE STATE'S REPLY TO ALVAREZ'S FIRST, SECOND, THIRD, AND FOURTH ISSUES

**Alvarez lacks standing to challenge the geofence-warrant because it did not implicate a "search" under the Fourth Amendment. Alternatively, the geofence-warrant, authorizing the search of Google's Sensorvault (*not* Alvarez or others) and seizure of only location-history data supported by probable cause narrowly tailored to the specific facts of the case, was neither unconstitutionally overbroad, unparticularized, nor "general" (Issue One).**

**The subsequently obtained Gmail-, social-media-, house/cell-phone-search-warrants were (or conceded to be) supported by sufficiently particularized probable cause. Moreover, Article 38.23(b)'s good-faith exception applies to bar suppression of the subsequently obtained evidence (Issues Two, Three, and Four).**

## ARGUMENT AND AUTHORITIES

In his first four issues, Alvarez contends the trial court erred in overruling his pre-trial-suppression challenges to the validity of several, sequential search-warrants obtained by police in the course of their investigation, each stemming from information obtained through a geofence-warrant that gave police the only break in the case. *See* (App.Br.:22-47). Because Alvarez relies on similar claims in challenging the various search-warrants, the State will address Alvarez's first four issues in a single reply.

## I.     Underlying facts

*Google location-history data*

As is typical with geofence-warrants (also referred to as reverse-location-

history searches), police utilized this new investigative tool in an attempt to solve a known crime with an unknown suspect. (RR4:27-28).

In a nutshell, when a Google-compatible device is being used, it "beacons" to any one of various signal sources (namely, GPS, cellular-tower, wifi, and bluetooth), (RR4:19,33,87-88,107), creating a geographical-location-data-point that is then saved and stored by Google—so-called "location history." (RR4:19-21,78). Although Google also collects "sensor" data about a device, such as how fast it is moving, its altitude, or whether it is being tilted, only location-history data is accessible by law enforcement via a geofence-warrant. (RR4:19-20, 86-88). But before such data can even be saved and stored by Google, because the default location-history setting is "off," the user must first affirmatively opt-in to have their device-location history stored and thereafter remain logged-in to his/her Google account. (RR4:20,26,86-88). Additionally, users can choose to delete their location history at any time, or even set their location history to be auto-deleted. (RR4:26,93-94).

The precision of each location-data-point varies depending on the source and strength of the signal generating it, and thus, for each latitude-and-longitude location-data-point Google provides to law enforcement, it also provides the type of signal source, together with a margin of error (measured in meters). (RR4:20-

22,52);(012023 SX10 at p.3, providing example of geofence-warrant data report).[3]

*The geofence-warrant*

El Paso Police Department ("EPPD") Crimes Against Persons Detective Adrian Garcia ("Det. Garcia") drafted the affidavit-application for the geofence-warrant, his first ever in his 22-year career with EPPD. (RR2:113,116). In his probable-cause affidavit, Det. Garcia recounted the facts known via the police's investigation thus far:

- On November 14, 2020, at 19:35 hours, police were dispatched to the Kaufmann residence located at 3010 Copper reference a shooting;

- Daniel was shot multiple times by a man who approached him on foot when he opened the door to his backyard as he waited for Georgette to arrive;

- Daniel described his assailant as a Hispanic male, approximately 6'2", bald, with a goatee, and wearing a blue heavy jacket with a hoodie underneath and jeans;

- Upon their inspection of the property in search of the shooter, officers discovered Georgette's lifeless body lying next to a running vehicle in the detached garage at the rear of the property, and bullet casings were observed next to Georgette's body;

- Police's ensuing investigation yielded no viable leads.

(012023 SX1-Warrant#38821013). Having set forth his training, qualifications, and

---

[3] The parties' pre-trial exhibits are contained in (sealed) Volume 20 of the reporter's record. For ease of reference, the State utilizes the court-reporter's PDF-bookmark identifier beginning with the hearing date in numerical format, i.e., "010923," etc.

current post, Det. Garcia described his training-and-experience-based knowledge regarding people's use of Android-powered mobile devices, Google's capacity for compilation and retention of users' location-history data, and general manner of generating the data. (012023 SX1). Specifically regarding cell-phone use, Det. Garcia detailed why he believed the suspect likely carried a cell-phone and why Google likely possessed evidence of the crimes.

For instance, Det. Garcia cited to a study showing that of all smart-phones operating on either an Android or Apple operating system ("OS"), 85.9% of them run on Adroid OS, Google's proprietary operating system, which supports not only cell-phones, but other types of mobile devices, such as smart-watches and tablets. *Id.* Even non-Android Apple-iPhones support various Google applications requiring users to have an associated Google account (and a registered password-recovery phone-number), which in turn allows Google to collect and store location-history data. *Id.* Some Google applications also offer location-enabled features that enhance subscribers' user-experiences. *Id.* And since location-data history is generated while the cell-phone performs various functions—such as sending and receiving texts and phone calls, or logging onto the internet or email—a suspect(s)'s location-history data likely showed his/her/their movements on the date of the offense. *Id.* While the cell-phone itself (the hardware) may not always retain this data, once the user

enables location-history data services on his/her device(s), the data is permanently stored by Google, unless and until the user deletes it. *Id.* And given that cell-phones and other smart-devices, a common-and-essential part of modern life, are carried virtually any time one leaves the house, it was likely that Google's Sensorvault[4] contained evidence of the case, be it in connection with a suspect or a witness. (012023 SX1). For reference, the probable-cause affidavit also included an aerial-view photograph of Memorial Park and immediate surrounding area. *Id.*

Incorporating Det. Garcia's affidavit by reference, the warrant authorized police to execute a series of three steps (typical for such warrants) to search Google's Sensorvault for location-history data captured within a 400-foot radius[5] surrounding the Kaufmann home (the "geofence") between 6:00-and-8:00 p.m. on the date of Georgette's murder. (RR2:55,72,120);(012023 SX1). Due to the specific location of the crime-scene, the geofence necessarily included the houses next to and across the street from the Kaufmann home. (RR3:20);(012023 SX10 at p.7).

In Step 1, Google was to provide location data for any devices located inside

---

[4] Although neither the parties nor witnesses referred to Google's location-history database as the "Sensorvault,"it is commonly referred to as such. *See, e.g.*, *United States v. Smith*, 110 F.4th 817, 822 (4th Cir. 2024); *United States v. Davis*, 109 F.4th 1320, 1337 (4th Cir. 2024).

[5] Google responds to geofence-warrants only if the target location is designated as either a radius surrounding a latitude-longitude point, or a square or rectangle consisting of four connecting latitude-longitude points. (RR3:71);(RR4:97).

the geofence within the designated-2-hour time frame. (012023 SX1-section (a)).

This step yielded a combined 202 location-data-points from 29 devices, each designated by a numerical "anonymized device ID." (RR2:33); (RR4:28,34,66,71); (RR14:140-41).

In Step 2, upon review of the initial Step-1 data, investigators would eliminate any devices readily identifiable as not having been in the target location a sufficient amount of time to constitute evidence. (012023 SX1-section (c)). To further narrow the scope of their search, investigators could then seek "contextual location coordinates," i.e., "additional location coordinate[s]" that fell outside the geofence but could show whether any of the initial Step-1 devices remained outside, did not stay for long-enough a period, or moved through the target location in a manner inconsistent with the known facts of the case, thus allowing their exclusion from the suspect-device pool. *Id.*; (RR2:88). Under this step, police requested additional contextual-location data for 17 of the original 29 devices, yielding a total of 1,660 combined data-points for those 17 (still-anonymous) devices. (RR4:95-96);(RR14:142-45). In seeking these additional, contextual-data-points, the original 2-hour-time-frame was extended roughly 30 minutes in either direction. (RR4:63,110).

And finally, under Step 3, police narrowed their suspect-device pool down to

5 devices, and it was only then that Google "unsmaked" the devices' subscriber-account information. (RR2:93-94);(RR14:146-47).[6] The warrant authorized police to proceed from Step1 through Step 3 without having to seek an additional warrant in-between. (RR4:97);(012023 SX1-sections(a)-(b)).

*The Google-derived evidence and next investigative steps*

From the Step-3-yielded data, police eventually focused on a single device with an associated Google account registered as "russelshacklford79905@gmail.com," whose listed owner was Alvarez. (RR3:63-66);(RR14:78-83,90). The police thereafter obtained a search-warrant for that "Russel Shacklford" Gmail account. (RR14:85);(050123 SX10-Warrant# 2021SW00206). From there, police identified Alvarez' social-media accounts (also registered under the "Russel Shacklford" moniker), which they also subsequently searched after obtaining additional search-warrants for those accounts. (RR14:10,90);(050123 SX11-Warrant# 2021SW00205);(050123 SX12-Warrant# 2021SW00207). After investigating the Gmail and social-media accounts and interviewing Alvarez's co-workers and a witness identified via the geofence data,

_____

[6] Steps 1 and 2 yielded a total of 27 individual location-data-points for device #1924446182 (the device ultimately tied to Alvarez) between 5:37-and-8:30 pm on date of the offense. *See* (012023 SX4 at p.3 [3 data-points], SX5 at p.34 [24 data-points]);(RR4:96). Many of Step-2's captured latitude-longitude points were identical.. *See* (012023 SX5 at p.34).

police secured a search-warrant for Alvarez's residence, where the murder weapon was discovered and ultimately connected to the crime-scene via ballistics analysis. (RR14:78-81,229-30);(SX100).

The trial court denied Alvarez' suppression motions urging exclusion of the evidentiary fruits of the geofence- and subsequent search-warrants.(CR:49-50,78-81,168-74,192,235,428,444).

*The CAST report*

At trial, FBI Special-Agent Sean MacManus, a member of the FBI's Cellular Analysis Survey Team ("CAST"), presented expert testimony explaining his analysis of the geofence-generated location-history data. (RR14:124,128). His CAST report, which plotted onto a map the location-data-points (each depicted in a circle representing their respective error-margin-distances in meters), was admitted into evidence. (RR14:150). On the whole, the CAST report demonstrated how Alvarez's device, in a series of 9 captured locations,[7] traveled from his home, to the Kaufmann residence, and back to his home in a manner consistent with the shootings' time and location. (SX91A at p.8-11);(RR14:155-57).

---

[7] These location-data-points and respective error-margins lay outside the physical demarcations of the map's depiction of the Alvarez residential structure. (SX91A at p.9, 11).

**II.      Standard-of-review and general-applicable law on search-warrants**

No warrant shall issue before a magistrate first finds probable cause to believe a particular item will be found in a particular place. *See State v. McLain*, 337 S.W.3d 268, 271 (Tex.Crim.App. 2011). Probable cause, in turn, exists when, under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found at the location to be searched. *McLain*, 337 S.W.3d at 271.

Typically, a trial judge's suppression ruling is reviewed under a bifurcated standard. *Id.* But when the appellant challenges the sufficiency of the probable cause supporting a search-warrant, review of a trial court's probable-cause determination is constrained to the four corners of the warrant's supporting affidavit. *See id.* There are no credibility determinations to be made, and so long as the issuing judge had a substantial basis for concluding that the four corners of the affidavit contained probable cause for the warrant-sanctioned search, reviewing courts defers to that determination. *See id.*

Employing this highly deferential standard, reviewing courts interpret the affidavit in a commonsensical-and-realistic, rather than hyper-technical, manner, deferring to all reasonable inferences the warrant-issuing magistrate could have made therefrom. *See id.* This "flexible and non-demanding" standard requires

reviewing courts be mindful that "the informed and deliberate determinations of magistrates empowered to issue warrants are to be preferred over the hurried action of officers who may happen to make arrests." *See id.* at 272 (quoting *Rodriguez v. State*, 232 S.W.3d 55, 59 (Tex.Crim.App. 2007)).

## III. The geofence-warrant, which Alvarez lacks standing to challenge, was neither constitutionally overbroad, unparticularized, nor impermissibly "general"(Issue One).

In his first issue, Alvarez contends the geofence-warrant[8] in this case was invalid because it lacked sufficient probable cause and particularity and was impermissibly overbroad, allowing investigators unbridled discretion to perform an impermissible "general" search without sufficient judicial oversight. (App.Br.:25). Since police obtained the geofence-warrant in this case, as a matter of first impression, several appellate courts, including the Texas Fifth Court of Appeals, have upheld the use of this novel investigative tool, be it on standing, substantive, or good-faith-reliance grounds.

As discussed below, Alvarez's appellate claim fails because the geofence-warrant did not implicate a constitutionally protected privacy interest, and

---

[8] Alvarez complains, generally, about several geofence-warrants, but because the evidence ultimately seized and utilized in the case came only from the last geofence-warrant, issued on April 23, 2021, (RR2:43-46,74-76,83,85-86);(RR3:52);(RR4:90), the State's analysis focuses on this final geofence-warrant.

-16-

furthermore, none of the geofence-warrant infirmities alleged by Appellant warrant overturning the trial court's suppression-denial rulings.

## A. The geofence-warrant-search did not implicate Alvarez's constitutionally protected privacy interest.

Alvarez contends the geofence-warrant was constitutionally infirm for various reasons. The State contended in the trial court that Alvarez had failed his burden of establishing an expectation of privacy in the geographically-and-temporally-limited geo-location data, and that the State obtained the geofence-warrant merely out of an abundance of caution. (CR:149,176-77);(RR5:6). Alvarez nevertheless fails to address this threshold issue on appeal. (App.Br.:25-33).

Relevant here, when the government's intrusion is not upon a trespass of constitutionally protected areas, the defendant has the initial burden of establishing a legitimate, subjective expectation of privacy society is prepared to recognize as reasonable. *See Kyllo v. United States*, 533 U.S. 27, 33 (2001); *Katz v. United States*, 389 U.S. 347, 351 (1967); *State v. Granville*, 423 S.W.3d 399, 405 (Tex.Crim.App. 2014). A defendant who fails to make this showing lacks standing to challenge the search, and the burden never shifts to the State to produce a warrant or otherwise show the search was reasonable. *See Granville*. 423 S.W.3d at 405; *Ford v. State*, 158 S.W.3d 488, 492 (Tex.Crim.App. 2005).

Alvarez failed to meet his initial burden to show he had a reasonable expectation of privacy, failing to so much as even assert (even now) a subjective expectation of privacy in the seized geofence-data. While Alvarez relied heavily on *United States v. Chatrie (Chatrie I)*, 590 F.Supp.3d 901 (E.D. Va. 2022),[9] to support his various suppression motions below, in *Chatrie II* (which Alvarez fails to address on appeal) the Fourth Circuit Court of Appeals upheld the lower court's denial of Chatrie's suppression motion, but on a different ground—that "Chatrie did not have a reasonable expectation of privacy in two hours' worth of Location History data voluntarily exposed to Google." *United States v. Chatrie (Chatrie II)*, 107 F.4th 319, 325 (4th Cir. 2024). That is, *Chatrie II* held the third-party doctrine (under which a defendant has no protected expectation of privacy in information voluntarily turned over to a third party, *see Smith v. Maryland*, 442 U.S. 735, 743-44 (1979)), applied to Chatrie's geofence-warrant-derived geo-location data to preclude any reasonable expectation of privacy. *See Chatrie II*, 107 F.4th at 330. Harmonizing *Carpenter v. United States*, 585 U.S. 296, 302, 315 (2018)(holding third-party doctrine did not destroy defendant's privacy interest in 7-days' worth of cell-site-location-information ("CSLI") turned over to third party in no meaningfully

_____

[9] The *Chatrie* Court expressed concerns about geofence-warrants but ultimately denied the defendant's suppression motion on the federal-exclusionary rule's good-faith-exception. *Chatrie I*, 590 F.Supp.3d at 941.

-18-

voluntary sense), with its prior decision in *Leaders of a Beautiful Struggle v. Balt. Police Dep't.*, 2 F.4th 330, 333-34, 341 (4th Cir. 2021)(en banc)(holding seizure of aerial photos capturing 32-square-miles every second for at least 40-hours-per-week under city's aerial-surveillance program constituted Fourth-Amendment "search"), the Fourth Circuit Court of Appeals reiterated that a careful examination of the United States Supreme Court's narrow holding in *Carpenter* did not apply to Chatrie's alleged privacy interest in the geofence-derived data. *See Chatrie II*, 107 F.4th at 330.

This is because *"Carpenter* identified two rationales that justify applying the third-party doctrine: the limited degree to which the information sought implicates privacy concerns and the voluntary exposure of that information to third parties," and "both rationales apply here." *Id.* Like the two-hours' worth of geo-location data obtained through a more-than-17-acres-wide geofence in Chatrie, *Chatrie I*, 590 F.Supp.3d at 918 (geofence encompassed over 17 acres and a nearby church), the three hours' worth of geo-location data seized in this case (at Step-2's furthest-expanded-search parameters), reduced to 9 movements overall to and from his house to the crime-scene, (SX91A at p.8-11); (RR14:155-57), was "[b]y no means [] an all-encompassing record of [Alvarez's] whereabouts . . . providing an intimate window into his personal life." *See Chatrie II*, 107 F.4th at 330 (citing and quoting

*Carpenter*, 585 U.S. at 311)(internal quotations omitted); *see also Sims v. State*, 569 S.W.3d 634, 645 (Tex.Crim.App. 2019)(holding appellant had no reasonable expectation of privacy in real-time CSLI records showing movements during less-than three hours via five cell-phone "pings," reasoning whether "search" was conducted turns on whether "enough" information was seized to violate a legitimate expectation of privacy). "All the government had was an individual trip viewed in isolation, which, standing alone, was not enough to enable deductions about what [Alvarez] does repeatedly, what he does not do, and what he does ensemble." *Id.* (citing and quoting *United States v. Maynard*, 615 F.3d 544, 562-63 (D.D.C. 2010))(internal quotations omitted). Alvarez's discovered geo-location movements were more akin to the "short-term public movements . . . [,]voluntarily conveyed to anyone who wanted to look," previously found by the Supreme Court not to constitute a Fourth-Amendment search. *See Carpenter*, 585 U.S. at 306 (recognizing such holding under *United States v. Knotts*, 460 U.S. 276 (1983)); *see also Chatrie II*, 107 F.4th at 330 n.16, 331 (reasoning a single, brief trip is no-more revealing than defendant's bank records or telephone-call logs and because search occurs once government *accesses* the responsive data from Google, proper inquiry was whether such access—the two hours' worth of Chatrie's location-history data—was a search.).

-20-

Like all Google users, Alvarez voluntarily exposed his location-history data to Google. (RR4:20, 26, 86-88). And he did so not "by mere dint of [his device's] operation, without any affirmative act on the part of the user beyond powering up," as is the case with CSLI data. *See Chatrie II*, 107 F.4th at 331 (noting same regarding how Google geo-location is collected and stored). Location-history services is *off by default* and must be *affirmatively* enabled by the user, who retains control over his geo-location data by turning it off or deleting it anytime he so desires. (RR4:20,26,86-88,93-94). A user can continue to use his Google-compatible device while location-history services remain off, and in this regard, while mobile *devices* may be "such a pervasive and insistent part of daily life" such that in "no meaningful sense" does a user "voluntarily assume[] the risk of turning over his location information" (as in the case of CSLI data), *location-history services* are not. *See Chatrie II*, 107 F.4th at 331 (observing two-thirds of Google users have opted out of location-history services and holding users voluntarily turned over geo-location history; thus, third-party doctrine applied to destroy any otherwise-existing privacy interest therein).

For this reason alone, the trial court did not err in denying Alvarez's motions to suppress the geofence-derived data, and Alvarez's first issue should be overruled. *See Romero v. State*, 800 S.W.2d 539, 543 (Tex.Crim.App. 1990)(suppression

ruling may be upheld for any reasonably supported theory of law applicable to the case, regardless of trial court's articulate reasoning).

**B. Det. Garcia's affidavit contained a substantial basis to support the geofence-warrant-issuing-judge's probable-cause-determination.**

In subsection-1 of his first issue, Alvarez contends the geofence-warrant affidavit contains insufficient probable cause to show he was carrying a cell-phone, or other mobile device, so as to create a fair probability that the geofence search would produce Alvarez's location-history data. (Ant.Br.:25-29). Alvarez maintains this is because Det. Garcia "provided no facts warranting a belief that more[-]than one suspect was involved [or that] a cell-phone or device was used by any offender," instead "h[anging] his hat" on the purportedly conclusory, insufficient assumption that "everybody carries phones." (Ant.Br.:26). Alvarez's claim fails for various reasons.

First, far from simply making a conclusory assertion that he believed the perpetrator likely possessed a cell-phone for no other reason than "everyone carries [cell]phones," (App.Br.:26), Det. Garcia set out various details which, read in a commonsense-and-realistic manner, enabled the issuing judge to conclude there was a fair probability that Google's Sensorvault contained the perpetrator's location history—evidence indeed produced from the search. In essence, Det. Garcia's

affidavit helped explain the convenience users derive from their frequent-if-not-constant use of their cell-phones (and other devices) and how that prevalent use generates the type of searched-for evidence, in turn making the presence of the perpetrator(s)' location-history-data probable. Smart-devices (including, but not exclusively, cell-phones) enable individuals to keep in constant communication in various ways, while also performing numerous other functions, like picture-and-document storage, navigation, and internet searches, and various applications use location-history services to enhance users' smart-device-use experiences. *See* (012023 SX1). Most existing smart-phones run on Google's proprietary OS, which requires that users have an associated Google account (and an associated password-recovery phone-number), through which location-history data is generated and stored. *See id.* In addition to smart-phones, Android OS supports other devices, such as watches and tablets (offering various non-communicative functions), and Google, too, collects and retains location-history data for *all* such Android-compatible devices. *See id.* Once opted into and enabled, location-history data remains in Google's Sensorvault so long as the user does not delete it. *See id.* Location-history data is collected by virtue of the Android-compatible device's continued operation to perform the very functions that make carrying these devices convenient in the first place (sending and receiving texts and phone calls, or logging

-23-

onto the internet or email). *See id.*

From the affidavit, the issuing judge, who was not required to check her commonsense at the door or ignore facts commonly known to most, *see Wells v. State*, 675 S.W.3d 814, 826 (Tex.App.–Dallas 2023, pet. granted)(quoting *United States v. James*, 3 F.4th 1102, 1105 (8th Cir. 2021)), thus had a substantial basis to conclude the myriad ways in which smart-devices make life more convenient (indeed, a virtual indispensability) made it fairly likely that not only was the perpetrator (or perpetrators) carrying a mobile device, but that through said convenience-serving use of the device(s), it was fairly probable that location-history data had been generated. And because the data remains forever-stored unless and until a user specifically acts to delete it (even if deleted from the device), it was also fairly probable that Google's Sensorvault contained the searched-for location-history evidence. This was even more probable, given that such data is generated by all Google-location-history-enabled *devices* (not just cell-phones), even those non-Android devices merely running Android-compatible applications.

Second, while Alvarez alleges that Det. Garcia's probable-cause affidavit set forth no basis for suspecting more-than a single assailant—which, he contends, in the absence of direct evidence to show the perpetrator was actually carrying a mobile device, was necessary for police to have probable cause to search Google's

Sensorvault—a commonsense-and-realistic review of the affidavit refutes this claim. From the affidavit's description of the then-known facts of the case, the warrant-issuing judge could infer it was equally likely that multiple individuals perpetrated the crime as it was that a single individual had. The ambush of two unsuspecting victims in their home is the type of crime commonly known to require planning, lying-in-wait, and speedy evasion, things often coordinated by multiple individuals, further justifying police's expectation that a mobile device had likely been used. And even though the affidavit described Daniel as having identified only one shooter, because Daniel did not hear any shots before or after being attacked, and it was only *after* police's arrival that Georgette's lifeless body was discovered (such that it was unknown when exactly Georgette was killed), the affidavit still supported a logical basis for suspecting multiple assailants. From the affidavit's factual description, the issuing judge could have reasonably inferred there were at least two co-conspirators. Indeed, the affidavit did not expressly exclude the possibility of multiple suspects; Det. Garcia averred that the geofence-warrant would aid law enforcement "in developing a suspect*(s)* in a felony" and that location-history data would "assist in identifying . . . the suspect*(s)* in this case." (012023 SX1)(emphasis added).

Third, proper issuance of a geofence-search-warrant does not require police

-25-

to provide specific evidence showing the suspect was carrying a cell-phone or other location-history-capable device. "The test [for probable cause] is not whether the warrant affidavit proves beyond a reasonable doubt, or even by a preponderance of the evidence, that a search of the listed location would yield a particular item of evidence; a 'fair probability' will suffice." *Foreman v. State*, 613 S.W.3d 160, 163 (Tex.Crim.App. 2020). Probable cause thus deals only in probability, not certainty. *Id*. "As multiple courts, including the United States Supreme Court, have recognized—cell[-]phones are ubiquitous," *see Wells*, 675 S.W.3d at 826 (citing *Carpenter*, 585 U.S. at 311), and warrant-issuing "[j]udges are not required to 'check their common sense at the door and ignore the fact that most people carry cell[-] phones with them all the time.'" *Id.* (quoting *James*, 3 F.4th at 1105). Thus, when faced with similar claims that the supporting affidavit's failure to include specific evidence showing the perpetrator was carrying a cell-phone at-or-near the time of the offense made issuance of a geofence-warrant improper, courts have held the ubiquitous nature of mobile devices will suffice. *See Wells*, 675 S.W.3d at 826 (for geofence-warrant to issue properly, probable-cause-standard, requiring probability rather than certainty, did not require State to produce specific evidence showing suspects were carrying cell-phones, which are ubiquitous); *see also Tomanek v. State*, 261 Md.App. 694, 716 (Md.App. 2024)(holding geofence-

warrant's issuance proper as affidavit-reviewing judge reasonably could infer single perpetrator was in possession of a cell-phone during crime's commission, reasoning "[i]t is undisputed [] cell[-]phones have become an integral part of everyday life [and that] many, if not most, people carry a cell[-] phone virtually all the time").

Importantly, the geofence-search-warrant sought to search Google's *Sensorvault*, not an actual *cell-phone*, a vital distinction for which Alvarez fails to account. Indeed, he relies primarily on *Baldwin v. State*, 664 S.W.3d 122 (Tex.Crim.App. 2022)—a *cell-phone*-search-warrant case—and cites only to various other cases dealing with searches of either actual cell-phones or cellular-providers' CSLI data, or geofence-warrant cases that did not address this particular, cell-phone-ubiquity argument. (Ant.Br.:26-28).[10] Alvarez further contends the *Wells* Court found probable cause in this regard only because "other factors," namely, the existence of multiple suspects, supplied the requisite probable cause. (Ant.Br.:28-29). But the *Wells* Court specifically reasoned that because cell-phones are ubiquitous and probable cause required probability, not certainty, the State was not required to provide specific evidence that the suspects were carrying cell-phones

---

[10] Alvarez attempts to further support his argument by noting the CCA's grant of PDR in *McDonald v. State*, 676 S.W.3d 204 (Tex.App.–Houston [14th Dist.] 2023), a case where "people carry cell-phones with them" was included in the CSLI-data-search-warrant. (App.Br.:28). PDR was refused on September 11, 2024.

before obtaining a geofence-warrant. *See Wells*, 675 S.W.3d at 826.[11]

This part of Alvarez's first issue should thus be overruled.

**C.** **The geofence-warrant, narrowly tailored to a specific, probable-case-supported time and place, was neither constitutionally overbroad nor unparticularized.**

In subsections 2 and 3 of his first issue, Alvarez asserts the geofence-warrant: (1) lacked sufficient particularity because it allowed officers unbridled discretion at Steps 2 and 3; and (2) contained temporally-and-geographically overbroad search parameters.[12] (App.Br.:30-31). But, as discussed below, several courts have held that a geofence-warrant supported by probable cause to search the temporally-and-geographically-limited Sensorvault data is not rendered constitutionally infirm by either the Step-2-data-production protocol or the mere possibility of including later-determined-to-be uninvolved individuals.

1. Particularity: alleged "unbridled discretion"

Here, the geofence was geographically and temporally tailored as much as

---

[11] Alvarez also cites *Price v. Super. Ct. of Riverside Cnty.*, 310 Cal.Rptr.3d 520, 542 (Cal.App. 4 Dist. 2023), for the proposition that probable cause requires something more-than an "every one carries cell-phones" assertion, including, at least, the existence of co-conspirators. (Ant.Br.:26-27). But even though *Price* dealt with multiple suspects, the *Price* Court specifically reasoned, "The common knowledge that most people carry cell[-]phones gave the issuing magistrate [probable cause to believe] the suspects were carrying cell[-]phones at the time of the shooting." *See Price*, 310 Cal.Rptr.3d at 542.

[12] Alvarez fails to cite to any part of the record to explain how this is so. (App.Br.:30-31).

possible under the particular facts of the case. The affidavit, which included a reference picture of the crime-scene's immediate surrounding area, demonstrated the crime's peculiar setting that resulted in the specific geographical and temporal parameters—the crime-scene was part of a residential area nested in Memorial Park, which, as detectives explained in the trial court, contained no physical barrier limiting the mode of ingress and egress to and from the Kaufmann residence. (RR3:23-24). Thus, all surrounding areas were possible routes for the assailant(s) to take before and after the crime. (RR3:23-24). Investigators deduced the shooting took place sometime between 7:00 and 8:00 p.m., but a more-precise time of the shooting was unknown. (RR3:27). And the manner in which the shootings were carried out (with Georgette shot outside as soon as she got out of the vehicle, which was still running when police located her body) indicated the shooter(s) likely pre-planned the crime and was already at-or-near the scene well-in-advance of the actual shootings. (RR3:29). Detectives thus drew the geofence as narrowly as possible to prevent obtaining either too little or too much data, avoid the more-highly-trafficked arterial streets, thoroughfares, and other surrounding areas, while still identifying those close enough to the perimeter of the crime-scene rendering them likely to be, at the very least, witnesses. (RR3:23-24,35-36,50). And a potential witness's identity constitutes evidence of a crime. *See In re Search*

*Warrant Application for Geofence Location Data Stored at Google Concerning an Arson Investigation (Arson)*, 497 F.Supp.3d 345, 355–56 (N.D. Ill. 2020)(searched-for evidence in geofence-warrant included identities of both perpetrators *and* witnesses).

The fact that the Step-2-protocol involved widening the bounds of the search as to those devices yet-to-be-ruled-out but located within the geofence at Step-1, which merely allowed officers the necessary discretion to *identify* which probable-cause-supported data the warrant permitted them to seize, was not fatal to the warrant's particularity. In this way, officers were merely operating within the issuing judge's probable-cause determination, just as they might do in exercising their discretion to identify what evidence a warrant authorizes them to seize from a house, a car, or a computer. The Fourth Amendment simply does not require warrants to specifically dictate *how* a search for the probable-cause-supported evidence will be executed. *See Dalia v. United States*, 441 U.S. 238, 257 (1979) (particularity requirement does not generally extend to means by which warrants are executed). "On the contrary, it is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by a warrant." *Id*. Nor does the Fourth Amendment require that *all* discretion *within* the prospectively approved scope of the warrant be eliminated.

Rather, it merely requires that the officers' discretion be sufficiently *limited* in order to allow the officers to identify the place to be searched and what evidence is to be seized (here, the Sensorvault data coinciding with the warrant's specified temporally-and-physically-limited three-step parameters). *See Bonds v. State*, 403 S.W.3d 867, 875-76 (Tex.Crim.App. 2013)(warrant sufficiently limited officer's discretion in executing warrant, whereas warrant failing to describe, at all, items to be seized lacked particularity on its face).

Accordingly, several courts have held the discretion afforded officers under Steps 2 and 3 is not fatal to a geofence-warrant's constitutional-particularity requirements. *See Price*, 310 Cal.Rptr.3d at 544 (officers' afforded discretion by Google's multi-step protocol constitutionally immaterial where geofence, though encompassing residential area, is narrowly tailored); *Wells*, 675 S.W.3d at (same); *see also United States v. Rhine*, 652 F.Supp.3d 38, 89 (D.D.C. 2023)(rejecting defendant's overbreath claim, noting data provided by Google outside initial time-frame served particularity-defining purpose by narrowing "the universe of devices" to be deanonymized at final (albeit judicially reviewed) step).

Alvarez's claim that the warrant's 3-Step protocol allowed officers "unbridled discretion" should likewise be overruled.

## 2. Alleged "general exploratory search"

Relying on *Ybarra v. Illinois*, 444 U.S. 85 (1979), and *Chatrie*, 590 F.Supp.3d 901, Alvarez appears to argue that the geofence-warrant was impermissibly overbroad because it lacked probable cause to search every single individual that may be located in the geofence. (App.Br.:30). But, again, Alvarez's claim fails to account for the fact that a geofence-warrant authorizes a search of a *place* (here, Google's Sensorvault), not a *person*. *Ybarra* involved a warrant to search a tavern and the *person* of the bartender for drugs, *see Ybarra*, 444 U.S. at 88, but a geofence-warrant "is not the same as the search of a body of a person, such that *Ybarra* would be implicated." *See State v. Contreras-Sanchez*, 5 N.W.3d 151, 170 (Minn.Ct.App. 2024), *review granted* (May 29, 2024)(quoting *In re Warrant Application for Use of Canvassing Cell-Site Simulator*, 654 F.Supp.3d 694, 709 (N.D. Ill. 2023)).

And to the extent Alvarez relies on *Chatrie* to argue that geofence-warrants must establish probable cause to search every single individual whose location-history data is found within the geofence's temporal-and-geographic bounds, (App.Br.:30), his reliance on *Chatrie I*'s reasoning is misplaced for the same reasons why (as noted above) *Ybarra* is not implicated. So long as the geofence is narrowly tailored, such that there is a fair probability that the location-history data of

perpetrators, co-conspirators, or witnesses will be found (as was done here), the mere possibility of implicating uninvolved third-parties (or the after-the-fact discovery of having done so) does not destroy the warrant's constitutionality. "[T]he relevant question is not *how* Google runs searches on its data, but what the warrant *authorizes the Government to search and seize*." *Rhine*, 652 F.Supp.3d at 82 (rejecting January-6th-Insurrection defendant's overbreath claim that, by requiring Google to query its entire Sensorvault without probable cause, geofence-warrant constituted unconstitutional "fishing expedition," specifically noting anonymized nature of responsive data)(emphasis added).

The Constitution is simply "not so exacting as to require the elimination of all discretion of the officers executing the search[-] warrant." *Price*, 310 Cal.Rptr.3d at 550 (quoting *In re Search of Info. Stored at Premises Controlled by Google (D.C.)*, 579 F.Supp.3d 62, 76 (D.D.C. 2021)(Harvey, Mag.J.)(granting geofence-warrant application)). "The degree of required particularity turns on what was realistic or possible in *this* investigation[.] [A] broader sweep can be lawful when a reasonable investigation cannot produce a more[-]particular description of the things to be seized prior to obtaining and executing the warrant." *Id.* (rejecting *Chatrie*-based particularity-and-overbreath attack of warrant for geofence encompassing victim's front-yard and abutting yards of 11 other homes,

distinguishing 17.5-acre geofence in *Chatrie* that (unlike here) implicated "large numbers of uninvolved individuals" without probable cause to believe they were either suspects *or* witnesses). As one federal magistrate observed in granting a geofence-warrant, "it is nearly impossible to pinpoint a search where *only* the perpetrator's privacy interests are impacted." *Arson*, 497 F.Supp.3d at 361–62 (pivotal issue is reasonableness of geofence-warrant-search, noting even "uninvolved party" may be a witness, whose identity constitutes evidence in narrowly tailored, probable-cause-supported geofence)(emphasis added); *see also D.C.*, 579 F.Supp.3d at 85 (geofence's potential to capture data of customers inside subject building, motorists driving by, or even employees of business next-door, was not fatal to geofence-warrant so long as no potential of sweeping up *substantial* number of uninvolved persons); *Contreras-Sanchez*, 5 N.W.3d at 169 (geofence-warrant's potential to reveal uninvolved-persons' data-points does not render it unconstitutional).

Indeed, under Alvarez's reasoning, all warrants authorizing the search of any premises, or any database (such as DNA, fingerprints, or even medical records) would be deemed unconstitutional by their mere operation in that, to identify the searched-for evidence, investigators (or those responding to warrants or subpoena requests) must examine *all* evidence before determining whether it is among that

authorized to be seized. *See D.C.*, 579 F.Supp.3d at 84 (observing, "Consider also a search of a business' filing cabinet or of a home office, where it is certain that some innocuous documents which may belong to persons other than the target of the investigation will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized. . . . And yet, such searches are routinely permitted.")(internal citations and quotations omitted); *Arson*, 497 F.Supp.3d at 361 ("As another example, when a court authorizes the search of an individual's email account, it includes private emails sent by non-perpetrators that were not intended to be seen by the government, and may contain intimate and personal details, but are nonetheless viewed by government agents in the search for evidence of the crime."). As the Fourth Circuit Court of Appeals noted in rejecting Chatrie's claim that " the search occurred when Google looked through its entire Location History database at the government's behest[,] *Carpenter* and *Beautiful Struggle* both held that a search only occurs once the government *accesses* the requested information." *Chatrie* II, 107 F.4th at 330 n.16 (citations and quotations omitted)(emphasis added).

"Ultimately, the touchstone of the Fourth Amendment is reasonableness," *Price*, 310 Cal.Rptr.3d at 550, and here, investigators narrowed the geofence's geographical and temporal parameters as much as practicable in order to obtain

relevant evidence while simultaneously excluding the data of as many uninvolved persons as possible, and a reasonable investigation of the particular, instant offense could not produce a more-particularized description of the items to be seized prior to obtaining and executing the warrant. *See id.*

For these additional reasons, Alvarez's first issue should be overruled.

**IV.     The subsequently obtained Gmail-, social-media-, and house/cell-phone-search-warrants were (or conceded to be) supported by sufficiently particularized probable cause. Moreover, under Article 38.23(b)'s good-faith exception, Alvarez was not entitled to suppression of the geofence-warrant's evidentiary fruits (Issues Two, Three, and Four).**

**A.     Underlying facts**

As previously noted, the geofence-location-history data allowed police to connect Alvarez to the suspect-device at the crime-scene and its associated "Russel Shacklford" Gmail account; police then obtained search-warrants for Alvarez's Gmail, Facebook, and Instagram accounts (all registered under the name "Russel Shacklford"), which in turn enabled them to a secure search-warrant for his house and cell-phone.[13] (RR3:63-66);(RR14:78-83,90,104-05).

The Gmail warrant, issued on August 3, 2021, requested Google-account

---

[13] As discussed below, the house-search-warrant also authorized a "dump" of Alvarez' cell-phone.

The house-search-warrant also incorporated an arrest-warrant. (050123 SX13-Search-Warrant#JMAG21-10591, Arrest-Warrant#JMAG21-6592). Alvarez does not complain about this arrest-warrant or an additional warrant to search his vehicle.

details derived from various of its associated applications, including live- and historical-location data, from July 1, 2020, through July 29, 2021; Detective Abraham Gonzalez's ("Det. Gonzalez's"), probable-cause affidavit is summarized as follows:

- his training-and-experienced-based knowledge that activation of Google-enabled devices requires users to register a new or existing Gmail account, enabling Google to collect and store geo-location data (and similarly describing how such data is collected and stored as it was in the geofence-warrant), as well as user-search history, generated whether the internet is accessed from a mobile or desktop device; and

- to facilitate precise identification of the sought evidence, Google is capable of searching for the specific "Shacklford" Gmail account by an International Mobile Equipment Identity ("IMEI"), an automatically-produced Gmail-to-device-association identifier.

(050123 SX10).

The Facebook- and Instagram-account warrants, issued on August 3, 2021, and August 23, 2021, respectively, similarly requested all associated-user information, identifiers for all devices associated with the target "Russel Shacklford" Facebook and Instagram accounts, user-attribution information, location-and-search history, messaging-and-call records (whether drafted, saved, posted, or deleted), and calendar, contacts, "friends," and communication details for the period between the accounts' creation and August 2, 2021 (Facebook), and August 18, 2021 (Instagram), respectively. (050123 SX11-12). In his social-media-

account-warrant affidavits, Det. Gonzalez explained his knowledge of the workings and wide popularity of the two platforms:

- Instagram was purchased by Facebook in 2012;

- As of 2018, Instagram has over 1-billion active users;

- As of 2017, Facebook also has over 1-billion active users, over half of which use the platform on their mobile devices;

- Both platforms require users to register and create profiles, in which users may include personal identifying information, as well as vast information about their personal lives;

- The platforms allow users to communicate through public-and-private-messaging options in a variety of ways;

- The investigation revealed Georgette used both platforms and their respective messenger and email services to facilitate several, secret romantic relationships; and

- Geofence-location-history data linked Alvarez to a device present at the crime-scene, which in turn revealed he owned Gmail, Instagram, and Facebook accounts under the "Russel Shacklford" moniker.

(050123 SX11-12). As to the Facebook warrant, Det. Gonzalez averred that

Alvarez and Georgette shared "six mutual friends" on Facebook. (050123 SX12).

The supporting affidavits for all three warrants contained the following details:

- a summary of the general details of the Kaufmanns' shooting;

- that a geofence-search produced records placing at the crime-scene a device associated with the "Shacklford" Gmail account, whose registered owner is Alvarez; and

- a brief, general summary of Det. Gonzalez's, training, experience, and current EPPD assignment.

(050223 SX10-12).

The seized Gmail and social-media communications detailed Alvarez's extremist political-and-religious beliefs and condemnation of those he characterized as "pro-choice Jewish Satan worshipers," culminating in his pre-meditated attack on the Kaufmanns in furtherance of his goal of "executing and exterminating the pro-choice Jewish Satan worshipers." *See* (SX92-92A). The "Russel Shacklford" Gmail records included an email, entitled "Judgment Day," sent by Alvarez the morning of Georgette's murder to a U.S. Army military-intelligence unit in Fort Meade and which contained several pictures of Memorial Park; in it, he stated:

> Later I will be going to memorial park those houses on the corner are generational cursed family that's why they get to live there. Tonight I going to take my silnced pistol in a pizza box. Ring the door bell and (I know they voted for bidden they had a faggot flag and a doll of President Trump hanging) ask if they voted for 'sleep Joe' and you see I say WITH THE FISHES MOTHERFUCKER!!

(SX92A).[14]

### B. The Gmail-and social-media-search-warrants are supported by sufficiently particularized probable cause (Issues Two and Three).

In Issues Two and Three, Alvarez similarly relies on *Ybarra*, 444 U.S. at 91,

---

[14] The State does not designate errors in the quoted language.

to complain that the subsequent search-warrants' evidentiary fruits should have been suppressed because they were supported by allegedly insufficient probable cause based on "mere presence at the scene," permitting "wholesale rummaging" through the accounts. (App.Br.:38-39).

Alvarez's reliance on *Ybarra* is once again misplaced—the complained-of warrants pertained not to a search of a person, but of a *place* (here, Google's, Facebook's, and Instagram's records), which "is not the same as the search of a body of a person, such that *Ybarra* would be implicated." *See Contreras-Sanchez*, 5 N.W.3d at 170 (and cases cited therein). To the extent Alvarez complains police had no evidence that Alvarez's geofence-linked *device* was actually used at the crime-scene, his reliance on this cell-phone-to-crime-nexus rule is misplaced—the places to be searched were *Google, Facebook*, and *Instagram*, not Alvarez' cell-phone, and Det. Gonzalez explained why there was a fair probability that *those* places contained evidence. *See Johnson v. State*, 682 S.W.3d 638, 648 (Tex.App.–Tyler 2024, pet. ref'd)(rejecting claim that affidavit failed to meet cell-phone-to-offense-nexus standard, noting search was for CSLI data in *Verizon's* records, not the cell-phone, reasoning cell-phone ubiquity may provide probable cause by merely connecting cell-phone's owner to offense).

As to Alvarez's lack-of-particularity claim, as discussed in subsection C-2 of

the State's reply to Issue One, a warrant is not an impermissible "general exploratory warrant" merely because investigators (or those responding to them), in order to identify which records fall under the scope of the warrant's authorized seizure, examine *all* records. *See D.C.*, 579 F.Supp.3d at 84; *Arson*, 497 F.Supp.3d at 361. Alvarez's claims in this regard likewise fail to account for the full scope of the probable-cause affidavit—expressly incorporated into the warrant by reference—setting out the specific types of data sought and limiting them to that which was tied to the offense described therein, and specifically, that which tended to show a connection between the account owner and the victims. *See Farek v. State*, No. 01-18-00385-CR, 2019 WL 2588106, at *7 (Tex.App.–Houston [1st Dist.] June 25, 2019, pet. ref'd)(mem.op., not designated for publication)(particularity requirement may be satisfied through express incorporation or cross-referencing of supporting affidavit describing items to be seized)(citing *United States v. Richards*, 659 F.3d 527, 537 (6th Cir. 2011)). Alvarez's claims improperly ignore the flexible nature of the particularity standard, which "var[ies] according to the crime being investigated, the item being searched, and the types of items being sought." *Id.* (citing *Richards*, 659 F.3d at 537). "When the circumstances of the crime make an exact description of the instrumentalities of a crime a virtual impossibility, the searching officer can only be expected to

describe the generic class of items he wishes to seize," and that is precisely what Det. Gonzalez did. *Id.* (also noting computer-records-search limited to records related to offense set forth in affidavit is appropriately limited). Here, Det. Gonzalez detailed how, based on his training and experience, the Gmail and social-media accounts contained the types of data sought, set out the details of the crime being investigated, and stated that the accounts' owner (Alvarez) was connected both to the crime-scene via the geofence-location data (as to the Gmail warrant) and to the victim (as to the social-media accounts).

Thus, the Gmail- and social-media-account-search-warrants' supporting affidavits contained a substantial basis for the warrant-issuing judge's sufficient-particularized-probable-cause finding, and Alvarez' second and third issues should be overruled. *See Bowden v. State*, No. 08-19-00057-CR, 2021 WL 3661163, *9, 11 (Tex.App.–El Paso Aug. 18, 2021, pet. ref'd)(not designated for publication)(failure to include probable-cause statement as to particular types of records in cell-phone-search-warrant did not render it improperly "general" or mere attempt to establish probable-cause where data sought was limited by description of offense and nexus between records and crime set forth in incorporated affidavit); *United States v. Bowers*, CR 18-292, 2021 WL 2843173, at *2-3 (W.D. Pa. July 8, 2021)(sufficient probable cause for Gmail-search-warrant where affiant averred,

based on training and experience, search would reveal identity of gmail-account user and that modes of communication offered by such account were often used to communicate and facilitate the instant offenses).

**C.     Alvarez fails to show reversible trial-court error in denying suppression of the house/cell-phone-search-warrant's evidentiary fruits. (Issue Four).**

### 1.     Underlying facts

In his "Second Supplemental Motion to Suppress Evidence," Alvarez contested the sufficiency of the probable cause supporting the search-warrant for his house and cell-phone, which motion the trial court denied. (CR:84,192). At trial, during the parties' motions-in-limine conference, Alvarez re-urged his previous challenge to the search-and-seizure of his cell-phone.[15] (RR13:8-9). At that time, however, Alvarez voluntarily conceded the sufficiency of the probable cause supporting the search of his house:

| [Court]: | [Defense Counsel], what else to you have for me in terms of the motion to suppress on the residence and the phone? |
|---|---|
| [Defense Counsel]: | Judge, I–I mean, **I have to admit that the–that the probable cause for the search of the house itself was sufficient**, assuming the Court believes that the previously obtained information from the previous |

_____

[15] Alvarez does not complain that no evidentiary hearing was held on this matter. (RR13:9).

warrants should not be excluded.

(RR13:8-9,12)(emphasis added). He stated the he was almost certain the cell-phone

was seized and searched via the housee-search-warrant, but contended (as he does

on appeal) that the warrant did not actually allow police to forensically "dump" the

contents of the cell-phone. (RR13:9,12-13).[16] The prosecutor responded that the

cell-phone had been found on Alvarez's person and seized incident to his arrest.

(RR13:14). The trial court again denied Alvarez's motion to suppress the fruits of

the cell-phone dump. (RR13:22).

> 2. <u>Alvarez waived his insufficient-probable-cause claim as to the house-search portion of the warrant.</u>

As set out above, whatever his previous complaint regarding the validity of

the house-search-warrant, Alvarez waived any such complaint when, at the time he

unilaterally chose to re-litigate the issue and sought a new ruling thereon, he

affirmatively conceded that the house-search-warrant was, indeed, supported by

sufficient probable cause, effectively abandoning any previous complaint in that

regard. He cannot now complain about the trial court's ruling acquiescing to his

concession. *Cf. Pena v. State*, No. 08-16-00236-CR, 2019 WL 1374152, at *22

---

[16] The second paragraph of the search-warrant included the following: "It is further requested to forensically analyze[,] 'dump[,]' any electronic device obtained through this search warrant by means of advanced techniques." (050123 SX13).

(Tex.App.–El Paso Mar. 27, 2019, pet. ref'd)(op. reh'g)(not designated for publication)(where appellant abandoned earlier request for week-long continuance and instead requested recess for afternoon only, appellant waived any complaint about the trial court's acquiescence to his request); *see also State v. Henry*, 25 S.W3d 260, 262 (Tex.App.–San Antonio 2000, no pet.)(suppression rulings are interlocutory).

Alvarez has thus waived this part of his fourth issue, which should thus be overruled. *Id*; *see also* TEX.R.APP.P. 33.1.

> 3. Any error in the trial court's refusal to suppress the cell-phone "dump" evidence was harmless.

As part of his multifarious fourth issue, Alvarez alleges that the house-search-warrant, which also authorized the search for, and seizure of, cell-phones and other devices, lacked sufficient probable cause to "dump" his cell-phone. (App.Br.:46). Curiously, Alvarez also contends that the warrant's language incorporating the affiant's request to "forensically analyze[, or] 'dump' any electronic device obtained" was insufficient to authorize the "dump" of his cell-phone. (App.Br.:46-47). While he also makes a bare assertion that his cell-phone was seized from his person, rather than his residence, he does not assert that such seizure was done unlawfully. (App.Br.:47).

-45-

In any event, the only cell-phone-derived evidence admitted at trial was testimony that the Memorial Park reconnaissance photos were taken on November 11, 2024. (RR15:10-11). Earlier in the trial, however, the State offered into evidence a diagram of Memorial Park, wherein various reconnaissance photographs taken by Alvarez of the park (and which he included in his "Judgment Day" email) were plotted throughout. (RR14:95-97). After his voir-dire examination of the sponsoring witness, Alvarez stated, "I have no objection to the diagram," and State's 106 (the diagram) was admitted into evidence and published to the jury. (RR14:96-97);(SX106). The witness identified each of the photographs, describing for the jury their contents and respective locations within the park. (RR14:98-104). Thus, the substantive equivalent of the cell-phone-derived evidence (that Alvarez took photographs of the park prior to carrying out the shootings) was admitted at trial without objection via the park diagram containing the various photographs,[17] (RR:97-104);(SX106); *see also* (RR13:12,17);(RR14:238-41)–wherein the State

---

[17] In his second-through-fourth issues, Alvarez makes a bare-bones, single-sentence allegation that the affidavit's information was also "stale." (App.Br.:38-39,47). Alvarez elaborates no further, instead referring the Court to his staleness discussion in Issue Four, wherein he discusses staleness only as to the murder weapon. (App.Br.:38, 42-45, 47). Alvarez sets forth no legal analysis as to any other type of evidence, failing to cite a single legal authority to support his staleness assertions in this regard. The State does not attempt to address these inadequately-briefed portions of Alvarez's complaints, and neither should this Court. *See Campbell v. State*, No. 08-10-00298-CR, 2011 WL 3198873, at *1 (Tex.App.–El Paso July 27, 2011, no pet.)(not designated for publication)("In short, Appellant engages in no legal discussion or analysis but rather appears to hope that we will make his arguments for him. We decline to do so.").

explained the photographs found in the cell-phone and those in the "Judgment Day" email were one-and-the-same), rendering any alleged error in failing to suppress the fruits of the cell-phone evidence harmless. *See Estrada v. State*, 313 S.W.3d 274, 302 n.29 (Tex. Crim. App. 2010)(admission of other similar evidence without objection renders evidence's improper admission harmless).

This part of Alvarez's fourth issue should thus also be overruled.

**D.    Article 38.23(b)'s good-faith exception applies to preclude suppression of the subsequent search-warrants' evidentiary fruits (Issues Two, Three, and Four).**

In Issues Two-through-Four, Alvarez appears to also argue that the evidence subsequently obtained through the Gmail, social-media, and house/cell-phone search-warrants should have been suppressed as tainted fruits of the geofence-warrant. (App.Br.:38,40,47). However, because the geofence search was "close enough to the line of validity" that an objectively reasonable officer preparing the complained-of search-warrant affidavits would have no reason to believe they were tainted by a prior illegality, Article's 38.23(b)'s good-faith exception to the exclusionary rule applies.

As the Court of Criminal Appeals explained in *McClintock v. State*, "Article 38.23(a)'s exclusionary rule does not apply when the challenged evidence was obtained by a law[-]enforcement officer acting in objective good[-]faith reliance

upon a warrant issued by a neutral magistrate based on probable cause."

*McClintock*, 541 S.W.3d 63, 72 (Tex.Crim.App. 2017)(internal citations and quotations omitted). Specifically, the Court held that Article 38.23(b)'s good-faith exception is "broad enough to embrace the fruit-of-the-poisonous-tree doctrine[,] [as well as to] accommodate a corollary: An officer who reasonably believes that the information he submitted in a probable[-]cause affidavit was legally obtained has no reason to believe the resulting warrant was tainted." *Id.* at 72-73. An officer executing such a warrant acts in objective-good-faith reliance thereon so long as the warrant is facially valid. *Id.* Thus, *McClintock* set forth the following rule:

> [T]he good-faith exception of Article 38.23(b) will apply when the prior law enforcement conduct that uncovered evidence used in the affidavit for the warrant was "close enough to the line of validity" that an objectively reasonable officer preparing the affidavit or executing the warrant would believe that the information supporting the warrant was not tainted by unconstitutional conduct.

*Id.* at 73 (internal citations and quotations omitted). Here, as acknowledged by Alvarez on appeal, the Texas Court of Criminal Appeals and United States Supreme Court (and this Court, for that matter) have yet to speak on the constitutionality of geofence-warrants. (App.Br.:24). Thus, there is yet no binding authority evaluating the constitutionality of geofence-warrants, let alone declaring them unconstitutional.

Indeed, courts grappling with constitutionality challenges to this novel

investigative tool, including every appellate court that either held or assumed

unconstitutionality of the challenged geofence-warrant, have routinely held that the

*Leon*[18] exception to the judicially-created, federal exclusionary rule applies to grasp

from the jaws of exclusion the evidentiary fruits of those geofence-warrants. *See*

*United States v. Smith*, 110 F.4th 817, 840 (5th Cir. 2024); *State v. Shields*, No. 23

CAA 08 0048, 2024 WL 3028251, at *5 (Ohio Ct.App. June 17, 2024); *Tomanek*,

261 Md.App. at 721; *Price*, 310 Cal.Rptr.3d at 552; *People v. Meza*, 312

Cal.Rptr.3d 1, 21 (Cal.App. 2 Dist. 2023); *Wells*, 675 S.W.3d at 827.

The complained-of geofence-warrant was the first ever obtained by

investigators on the case. (RR2:113,116). *Chatrie I*, the case primarily relied on by

Alvarez in his various suppression motions in the trial court, was not issued until

March 3, 2022, nearly a year *after* the geofence-warrant was obtained in April of

2021. *See* (012023 SX1). And even well after *Chatrie I*, the first intermediate

appellate court in Texas to issue an opinion on a constitutional challenge to a

geofence-warrant in *Wells*, assuming without deciding whether the geofence-warrant

implicated a "search" under the Fourth Amendment, upheld the geofence-warrant

---

[18] *United States v. Leon*, 468 U.S. 897, 920 (1984)(holding federal exclusionary rule does not apply when officer has, in good faith, obtained a warrant from a judge before conducting his search and adhering to the scope authorized therein).

search in that case. *See Wells*, 675 S.W.3d at 827.[19]

As previously discussed, only after exhausting all other investigative avenues did officers in this case seek a geofence-warrant at all. And when they did, they fashioned it the most-restrictive possible manner to obtain evidence by way of locating the suspect (or suspects), witnesses, or both. Given these efforts by police to search only as much data as was necessary to identify evidence of the crimes—particularly in light of rapidly advancing technology and lack of judicial guidance on this specific, novel investigatory technique at the time that officers executed the warrants incorporating the geofence-derived evidence—their reliance on the warrants fits squarely within *McClintock* and Article 38.23(b)'s good-faith exception. *See McClintock*, 541 S.W.3d at 74 (where Supreme Court did not make illegality of prior conduct "crystal clear" until *Jardines*, an officer's reliance upon a warrant-affidavit incorporating the later-determined-to-be illegal curtilage-dog-sniff

---

[19] Noting the "dearth of authority directly on point and the novelty of the particular surveillance technique at issue," the *Wells* Court held reliance on the geofence-warrant was done in good faith. *Id.* While the *Wells* Court, citing *Leon* and Article 38.23(b), appeared to have applied the good-faith exception to the alleged *initial* illegality (the geofence-warrant itself), the State believes that, under a careful reading of *McClintock*, a proper application of Article 38.23(b)'s good-faith exception evaluates whether an officer's reliance on a subsequently obtained, probable-cause-supported search-warrant (rather than on the initial geofence-warrant) tainted by the "prior illegality" of a geofence search was done in objective good faith. *See McClintock*, 541 S.W.3d at 73-74 (deciding whether, under article 38.23(b), officers, at the time of executing a warrant which probable cause was predicated on a curtilage-dog-sniff (which was not declared illegal by the Supreme Court until the pendency of the appeal in *Florida v. Jardines*, 569 U.S. 1 (2013)), had a good-faith basis to believe their *previous* use of a drug-detection dog would not adversely affect the validity of the warrant).

was in good faith under Article 38.23(b)).

For these additional reasons, Alvarez' second-through-fourth issues should be overruled.

**THE STATE'S REPLY TO ALVAREZ'S FIFTH ISSUE**

**Where the jury was presented with evidence that Alvarez believed his conduct to be illegal merely under "man's law" and that he thus undertook various efforts to avoid detection, viewing the evidence in a neutral light and affording due deference to the jury's weight-and-credibility determinations, despite the evidence of Alvarez's mental disease, the jury's rejection of Alvarez's insanity defense was not so against the great weight of the evidence as to be manifestly unjust.**

**ARGUMENT AND AUTHORITIES**

In his fifth issue, Alvarez challenges the factual sufficiency of the evidence supporting the jury's rejection of his insanity defense, *see* (App.Br.:50-55), which challenge is without merit and should be overruled.

**I.     Underlying facts**

As part of his presentation of his insanity defense during his guilt-innocence case-in-chief, Alvarez took the stand. During the State's cross-examination, the following exchange occurred:

| [Prosecutor]: | So it's better to obey God's law than man's law; is that correct? |
| [Alvarez]: | Yes. |
| [Prosecutor]: | So you acknowledge that there are laws against the murder of an individual? |
| [Alvarez]: | Yes. |
| [Prosecutor]: | . . . You acknowledge that we have legislators who make |

up the laws in the State of Texas, correct?

[Alvarez]:    Correct.

* * *

[Prosecutor]:    . . . So you know that there are certain laws within society that we all have to follow, correct?

[Alvarez]:    Correct.

[Prosecutor]:    One of those is murder. You cannot murder someone, correct?

[Alvarez]:    Correct.

[Prosecutor]:    But you did on November 14, 2020?

[Alvarez]:    I don't believe that I did.

[Prosecutor]:    . . . You believe that morally under God's law you were following God's law, correct?

[Alvarez]:    Correct.

[Prosecutor]:    But under state law, you committed a murder, correct?

[Alvarez]:    I don't believe so.

(RR15:186-88). Also on cross-examination, Alvarez acknowledged that he had tried to get abortion laws changed. (RR15:187); *see also* (RR15:102-05,110-13,126-38,174-75,179-86–Alvarez's direct-examination testimony regarding his considerable efforts, including sending hundreds or thousands of text-and-email

-53-

communications to various people in hopes of influencing them to change abortion laws). Alvarez also acknowledged that, although he wanted to change abortion laws, he did not care to follow the law against killing people:

| [Prosecutor]: | So you do follow some man's law, correct? |
| --- | --- |
| [Alvarez]: | Correct. |
| [Prosecutor]: | You just pick and choose what you want to follow, correct? |
| [Alvarez]: | Under divine revelation, yes. |

* * *

| [Prosecutor]: | Yet you killed someone. You didn't want to follow that law, correct? |
| --- | --- |
| [Alvarez]: | Correct. |

(RR15:192-93). When questioned about his responsibilities in enforcing laws at his past jobs, Alvarez acknowledged that as a security guard for a railroad company, he had been required to report violations of the law, such as criminal trespass and "illegals riding on the cars or in the train." (RR15:196-97). As a gas-station attendant, he was not allowed to steal from the store, and he was required to report theft by others. (RR15:204-05). Alvarez agreed he would not have been allowed to take things from passengers' luggage while working as an airline-baggage handler because that would constitute theft, which was against the law. (RR15:197-98).

Alvarez further agreed he had been required to enforce certain laws while working as a Traffic-Security-Administration ("TSA") screener, such as not allowing things like weapons and bombs. (RR15:203-04). Alvarez also explained he understood "CBD and D-8," which he sometimes used, to be "semi-legal" because he understood that "Texas has not legalized the THC." (RR15:194).

When it came to the offense of murder, Alvarez stated, "I think murder is illegal, and I think it is wrong," but opined he did not think what he did was wrong. (RR15:204,209-10). Alvarez disputed that he committed murder and claimed that he believed he committed an "execution" of a "witch" that was "generationally cursed . . . from all the acts of [S]atanism in the entire [Memorial P]ark" that was "ordained by God." (RR15:194-95,206).

During questioning on the murder's circumstances, Alvarez agreed it had been dark outside when he went to the Kaufmann residence, and that he did not park in front. (RR15:212,217). Initially, Alvarez agreed he wore "the mandatory face mask" when he approached the house, albeit only to protect himself and not others. (RR15:212). But later, he admitted that during his insanity-defense evaluation by Dr. Timothy Proctor (the State's expert witness), he said he had worn the mask to hide his face, and that he had worn gloves to avoid leaving fingerprints and getting caught. (RR15:214); *see also* (RR15:174-76);(RR16:136). Alvarez

admitted he had approached the residence with his firearm inside a pizza box, which pizza box he took with him after he shot and killed Georgette. (RR15:218, 221-22); *see also* (RR15:169-70).

Alvarez agreed he had also told Dr. Proctor that, after he shot the Kaufmanns, he felt it urgent that he leave the scene because he knew the police would be coming and would arrest him for murder, so he left the scene to avoid being arrested, which he claimed would have also "stopped [his] message from coming out." (RR15:193-94,220-23). Admitting having been concerned about being tried in a "secular court," Alvarez further testified as follows:

> [Prosecutor]: Because you knew that it was a violation of state law to murder someone, correct?
>
> [Alvarez]: Correct.
>
> [Prosecutor]: Yet you did it anyway; is that correct?
>
> [Alvarez]: Correct.

(RR15:225). Alvarez opined that if there had been a police car in front of the victim's residence, he did not believe he would have killed her because he would have been arrested. (RR15:225-26).

Previously, on direct-examination, Alvarez testified that on the morning of November 14, 2020, he sent to a U.S. Army military-intelligence unit in Fort Meade

an email from the alias, "Russel Shacklford" email address, with "Judgment Day" in the subject line and in which he set out his alleged concerns about the "Clear and Present Danger" to the President and the country posed by the "Jews and Christians practicing judism [sic]," a purportedly "satanic and unlawful [J]ewish practice," his wish to stop abortions, and his plans to go to one of the "generationally cursed" houses on Memorial Park with a "silnced [sic] pistol in a pizza box." (RR15:106-10,154-56,160-61);(SX92A). But on cross-examination, Alvarez agreed that although he signed the email with "Joseph," he did not provide a middle or last name, phone number, or address. (RR15:227-28); *see also* (RR15:156,160). Alvarez also agreed that he did not in that email, or in any of his other communications, tell anyone that he had shot and killed someone because she was a witch. (RR15:188,221).

To support his insanity claim, Alvarez presented during his case-in-chief the testimony of Dr. Schutte, a psychologist, who opined that Alvarez had schizoaffective disorder, which he characterized as a severe mental disease that impairs a person's ability to reason and determine whether certain conduct might be wrong or illegal, that because of his delusions, Alvarez did not know that his conduct was wrong or illegal, and that he was insane at the time of the offense. (RR16:20,53,56-60,62,65-68,75). Dr. Schutte explained that Alvarez understood

that murder is a crime but did not think that he committed murder because God authorized him to take a life. (RR16:69-72).

The State's expert witness, Dr. Proctor, also a psychologist, opined that Alvarez had a "delusional disorder, grandiose type that includes bizarre content" and that he had a severe mental illness that was a major contributor to his conduct at the time of the offense. (RR16:116,131-32,141-42,149-50,154-55). Dr. Proctor further opined, however, that although he (Alvarez) had a severe mental disease, Alvarez knew his conduct was wrong, in that it was illegal, and that he was not insane at the time of the offense. (RR16:142-43). Dr. Proctor explained that his determination that Alvarez knew his conduct was wrong was based on his actions before, during, and after the offenses—especially actions to avoid detection, such as "doing it at night, wearing dark clothing, wearing gloves, hiding the gun in a pizza box, having a silencer or suppressor, wearing a mask, running, getting out of there, not staying around," as well as the fact that Alvarez continued to tell people about his beliefs but not that he committed the offense, and that he indicated he would not have gone through with shooting the victims if a police officer had been there because he knew the officer would have tried to stop him. (RR16:135-39,143-44,163-64,178).

## II. Standard-of-review and general applicable law on insanity

In a factual-sufficiency review of a rejected affirmative defense on insanity, the reviewing court should determine whether, considering all the evidence in a neutral light and affording due deference to the jury's weight-and-credibility determinations, the jury's adverse finding was so against the great weight and preponderance of the evidence as to render it manifestly unjust. *See Matlock*, 392 S.W.3d at 671; *Templeton v. State*, No. 08-16-00018-CR, 2019 WL 1785476 at *5 (Tex.App.–El Paso Apr. 24, 2019, pet. ref'd)(not designated for publication). An appellate court may sustain a factual-sufficiency challenge "only if, after setting out the relevant evidence and explaining precisely how the contrary evidence greatly outweighs the evidence supporting the verdict, [it] states why the verdict is so much against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased." *See Matlock*, 392 S.W.3d at 671. If a reviewing court so concludes, the remedy is a new trial, not an acquittal. *See id.*; *Villanueva v. State*, No. 01-20-00303-CR, 2021 WL 2832974 at *13 (Tex.App.–Houston [1st Dist.] July 8, 2021, no pet.)(mem. op., not designated for publication).

Texas law presumes that a criminal defendant is sane and that he intends the natural consequences of his acts. *See Ruffin v. State*, 270 S.W.3d 586, 591 (Tex.Crim.App. 2008). Because insanity is an affirmative defense, the defendant

bears both the burden of proof, as well as that of persuasion by a preponderance of the evidence. *See Bigby v. State*, 892 S.W.2d 864, 870, 875 (Tex.Crim.App. 1994), *overruled in part on other grounds by Tennard v. Dretke*, 542 U.S. 274 (2004); *Dashield v. State*, 110 S.W.3d 111, 115 (Tex.App.–Houston [1st Dist.] 2003, pet. ref'd); *see also Villanueva*, 2021 WL 2832974 at *11.

To satisfy this burden, a defendant must prove that: (1) because of a severe mental disease or defect, (2) he did not know his conduct was wrong. *See Ruffin*, 270 S.W.3d at 592; *Dashield*, 110 S.W.3d at 115. In this context, "wrong," means "illegal." *Ruffin*, 270 S.W.3d at 592. The Court of Criminal Appeals has framed the question for deciding insanity as follows: "Does the defendant factually know that society considers this conduct against the law, even though the defendant, due to his mental disease or defect, may think that the conduct is morally justified?" *See id.*

The affirmative defense of insanity is a legal issue—not a medical one. *See Graham v. State*, 566 S.W.2d 941, 949 (Tex.Crim.App. 1978); *Dashield*, 110 S.W.3d at 115. Thus, although capable of aiding the trier-of-fact in determining the ultimate issue of insanity, expert-witnesses testimony is neither necessary for the State to rebut an insanity claim, nor does it dictate the result. *See Graham*, 566 S.W.2d at 949-50; *Dashield*, 110 S.W.3d at 115. The ultimate determination of whether a person understands that his actions are illegal is reserved to the fact-

-60-

finder. *See Villanueva*, 2021 WL 2832974 at *11 (and cases cited therein). The trier-of-fact may accept or reject, in whole or in part, the testimony of any witness, including that of an expert. *See Dashield*, 110 S.W.3d at 115. Consequently, appellate courts should rarely overturn a jury's findings on this issue. *See Graham*, 566 S.W.2d at 953; *Dashield*, 110 S.W.3d at 115.

## III. The jury had factually sufficient evidence to reject Alvarez's insanity defense.

In this case, viewing the evidence in a neutral light and affording due deference to the jury's weight-and-credibility determinations, the jury's rejection of Alvarez's insanity defense was not so against the great weight of the evidence as to be manifestly unjust. No doubt, the evidence established Alvarez believed himself *morally* justified in killing Georgette and shooting Daniel, but it was also replete with examples of Alvarez's clear, lucid understanding of various laws, the workings of our nation's legal system (which he articulated were based on "secular" laws and not on religious beliefs), and the illegality of his conduct thereunder. His various efforts to change the abortion laws (necessarily requiring him to understand that in order for abortions to be legal in various part of the country, the laws first needed to be changed) evinced his understanding that the legality of something depended on the laws created and passed by the Legislature. (RR15:102-05,110-13,186-

-61-

87);(RR15:174–wherein Alvarez explained his concerns about being apprehended because "[T]he courts are secular and they don't care about God and they don't care about religion. I would have been stopped from spreading the word more."). And although he painted himself as morally in the clear for his crimes, he nonetheless acknowledged that he simply *chose* not to follow the laws *prohibiting* them. (RR15:192,225–wherein Alvarez described the distinction between God's and man's law, confirmed he followed some of man's law, and indicated he knew committing murder was a violation of state law but did it anyway).

Despite his reticence in directly admitting his legal culpability, Alvarez acknowledged he would have been arrested had he not successfully fled the crime-scene before police arrived, albeit while expressing additional concern over being rendered unable to continue his so-called mission by such an arrest. (RR15:175-76). He also acknowledged his various efforts to conceal his crimes, including wearing gloves to avoid leaving behind fingerprints, concealing his weapon in a pizza box, failing to summon police and leaving the scene, and wearing a mask that served to both protect him from COVID-19 and conceal his face. (RR15:174,212,214).

Alvarez nevertheless argues that the jury's rejection of his insanity defense was against the great weight and preponderance of the evidence because: (1) Drs. Schutte and Proctor allegedly opined that Alvarez actually believed some of the

things he related to the jury, (RR16:38,130,149), such as his alleged beliefs regarding the fate of aborted fetuses, the role of Satanism as it relates to abortions, and the Satanic activity around Memorial Park that he believed resulted in the residents around the park being "generationally cursed," (RR15:59-62,68,71-81 79,85-87,91-98,103,112,135-36,141-49,152-54,158-62,170-71); and (2) he presented testimony he asserts supports his contention that he believed he was sanctioned by God, and thus morally justified, to execute satanic abortionists, including the victims, whom he characterized as a "generationally cursed" witch and warlock . (RR15:161-62,165,168-72,177-78,184-86); *see also* (App.Br.:50-55).

But Alvarez's claims in this regard fail to both account for the totality of the evidence presented on the issue of insanity, as well the law on insanity defenses. Because, even if the jury accepted Alvarez's professed extremist religious beliefs about aborted fetuses, satanic-abortion rituals being performed in Memorial Park, and the Kaufmanns being "generationally cursed," and even if it further accepted that these beliefs were a result of a severe mental disease or defect, the jury was presented with overwhelming evidence that at the time of the offenses, Alvarez nonetheless knew his conduct was wrong. The jury was thus tasked with answering whether, despite Alvarez's mental-illness-induced belief that his conduct was morally justified, he knew that society (i.e., "man's law," as Alvarez described it)

regarded the murder of Georgette and the shooting of Daniel against the law. *See*

*Ruffin*, 270 S.W.3d at 592.

The jury was presented with ample evidence that Alvarez knew society regarded his conduct as legally wrong and that it was for this reason he took various precautions to avoid detection. He testified that he knew that killing a person was wrong under man's "secular" laws but did it anyway. (RR15:225). And in his own words, he told the jury he knew his religious beliefs would not legally excuse his conduct, stating that he wore gloves and wore a mask because "the courts are secular and they don't care about God and they don't care about religion. I would have been stopped from spreading the word more. . . .They would have arrested me [and] stopped this—the message from coming out." (RR15:174,194). The fact is, in order for Alvarez to fear he would be "stopped from spreading the word" by police after shooting the Kaufmanns, he necessarily also had to believe he would have been arrested, and the only reason he would have to believe he would be arrested is that he knew his conduct was against the law. *See Pillow v. State*, No. 13-20-00507-CR, 2022 WL 4102786, at *5 (Tex.App.–Corpus Christi-Edingubrg Sept. 8, 2022, no pet.)(mem.op., not designated for publication)(appellant's statement that he wanted to avoid being arrested for shoplifting could be understood to mean he knew his actions were illegal, even if he thought they were otherwise

moral due to some psychotic delusion).

Alvarez's purported-insanity defense boiled down to this: he knew that society regarded his conduct as illegal; he just did not care because he thought he had the moral high-ground. *See* (RR16:164–wherein Dr. Proctor explained he opined that, rather than fail to appreciate the illegal nature of his conduct, Alvarez merely felt morally justified, which is not the issue in an insanity defense). This is simply not enough to sustain an insanity defense, and the jury's rejection thereof was thus supported by factually sufficient evidence. *See, e.g.*, *Ruffin*, 270 S.W.3d at 592 (issue in insanity defense is whether defendant, despite mental disease or defect causing him to believe he is morally justified, nonetheless understands *society* considers his conduct to be illegal); *Morrow v. State*, 486 S.W.3d 139, 154 (Tex.App.–Texarkana 2016, pet. ref'd)("If the accused knows that his conduct is 'illegal' by societal standards, then he understands that his conduct is wrong, even if, due to a mental disease or defect, he thinks his conduct is morally justified."); *Bartel v. State*, No. 02-16-00020-CR, 2017 WL 1089689, at *4 (Tex.App.–Ft. Worth Mar. 23, 2017, no pet.)(mem.op., not designated for publication)(appellant's undisputed mental illness, while tragic, did not, alone, equate to legal insanity; despite appellant's belief he had to carve pentagram onto his son's back to "save [his] wife's soul" because "women are so sinful, so, therefore, the innocent children

-65-

have to sacrifice their blood for forgiveness," he failed to conclusively prove insanity where he admitted he knew his conduct was against "man's law" and that his actions would result in legal trouble for him).

Accordingly, Alvarez's fifth issue should be overruled.

**THE STATE'S REPLY TO ALVAREZ' SIXTH ISSUE**

**Where Alvarez, having failed to review in its entirety the complained-of video-exhibit, failed to identify for the trial court the video's allegedly objectionable portions, he has failed to preserve for review, or demonstrate the requisite harm warranting reversal for, any evidentiary-ruling complaint**.

**ARGUMENT AND AUTHORITIES**

In his final issue, Alvarez challenges the admission of a post-arrest "walk-through" video of his residence, claiming it constituted irrelevant, unfairly prejudicial evidence painting him a "gun nut." (App.Br.:55-56). Alvarez's final claim should be overruled.

**I.      Underlying facts**

When the State sought to introduce State's Exhibit 93, a roughly 25-minute-long video depicting the general state and contents of Alvarez's residence during the evidence-collection process, Alvarez, though acknowledging his failure to review the video in its entirety, without pointing to any specific objectionable portions therein,[20] objected that it showed "a large amount of weapons and ammunition that have nothing to do with the crime in question," as well as books and magazines "involv[ing] weapons and the like," which he claimed was irrelevant, unfairly

---

[20] Instead, Alvarez appeared to point the Court to "like 100 other photos" the State had "of basically, the walk-though," of which only nine were admitted into evidence. (RR14:173,175);(SX94-99,104).

prejudicial, improper-extraneous evidence painting him a dangerous "gun nut." (RR14:170-72,174,178,191). When the State replied he had opened the door, Alvarez acknowledged he showed the jury various photographs of the residence during opening statement, but maintained he had been careful to omit any that depicted weapons. (RR13:46);(RR14:172-73). The trial court agreed to review the video but warned Alvarez that it failed to see how possessing multiple weapons and literature on the subject "ma[de] him a gun nut;" after review, the trial court admitted the video into evidence. (RR14:175,192).

The State published the video but passed the sponsoring witness immediately thereafter. (RR14:194). During their respective jury arguments, neither party alluded to the video or the subject of multiple-gun or gun-literature ownership. (RR17:21-50).

## II.    Standard-of-review

Unless falling outside the zone of reasonable disagreement, a trial court's admissibility ruling must not be disturbed on appeal. *See Powell v. State*, 63 S.W.435, 438 (Tex.Crim.App. 2001).

## III. Alvarez waived his evidentiary-ruling complaint.

As a preliminary matter, Alvarez failed to preserve his complaint about State's Exhibit 93's admission. While Alvarez made a general objection to the video's multiple-guns-and-reading-materials' depiction, he failed to direct the trial court to the specific objectionable portions of the video (which he had yet to view in its entirety). Certainly, Alvarez did not (and does not) assert the entire video was comprised of nothing-but multiple-guns-and-gun-literature depictions, nor does he now challenge any of the State's various pictures admitted into evidence, plucked from a collection Alvarez characterized at trial as the functional-equivalent of the walk-through video, some of which he showed to the jury in support of his defense during opening statement.  (RR13:46);(RR14:172);(SX94-99,104).

Even now, Alvarez fails to direct this Court to any specific portions of the complained-of video he contends were inadmissible.[21] Simply, "a trial court is not required to sort through challenged evidence to segregate the admissible from the inadmissible." *Ross v. State*, 154 S.W.3d 804, 813 (Tex.App.–Houston [14th Dist.]

---

[21] In his roughly-two-page-long argument section for this issue, Alvarez makes only two citations to the record: first, to "RR14:191," wherein the trial court mentions the exhibit was split into two videos, followed by Alvarez stating he did not recall whether he viewed both portions of the video; and second, to a non-existent "SX 191." (Ant.Br.:55).

Alvarez offers not even a cursory analysis to support his complaint, (Ant.Br.:55-57), leaving the State to surmise his claims in its attempt to reply and effectively asking this Court to find error only after arguing his case for him. For this reason, also, Alvarez's final issue should be overruled. *See* TEX.R.APP.P. 38.1(i); *Campbell*, 2011 WL 3198873 at *1.

2004, pet. ref'd). By failing to object to the specific portions of the video he claimed were inadmissible, Alvarez failed to preserve his complaint. *Id.* at 812-13 (holding appellant waived irrelevant-and-unfair-prejudice-based complaint about videos' admission where he failed to specifically object to their allegedly inadmissible portions). For this reason alone, Alvarez' sixth issue should be overruled.

## IV.    Error, if any, was harmless.

Erroneous evidentiary rulings are ordinarily non-constitutional error that are disregarded if, after examining the record as a whole, including: (1) the character of the alleged error and its likely consideration relative to other evidence; (2) the nature of the verdict-supporting evidence; (3) the existence and degree of additional evidence indicating guilt; and (4) whether the State emphasized the complained-of error, there is a fair assurance that the error did not influence the jury or had but-a-slight effect. *See* TEX.R.APP.P. 44.2(b); *Bagheri v. State*, 119 S.W.3d 755, 763 (Tex.Crim.App. 2003).

While the State does not concede the merits of Alvarez's improper-admission claims, even assuming error, it was harmless. As Alvarez himself sets out, the purportedly objectionable video-depiction of the presence of weapons was not tied to the charged crimes, nor did the State allege Alvarez even owned them. Aside from the time it took to publish the roughly 25-minute-long video-exhibit, of which

only some four minutes depicted any weapons, ammunition, or writings concerning weapons, the State devoted no additional time to its presentation, foregoing even broaching the subject of multiple-gun, ammunition, or gun-literature ownership or otherwise alluding to the video even once.

To the extent Alvarez contends the walk-through video swayed the jury into believing he was a violent, dangerous man, (App.Br.:56), Alvarez fails to explain how it was any more damning that his own testimony, wherein he made clear that, as sole arbiter of the myriad so-called, self-perceived "revelations" about satanic abortionists he claimed guided his heinous acts, he stood—unapologetic—by his violent crimes. (RR15:144-47,158,161,165-67, 171-72). Simply, it was uncontested that Alvarez perpetrated the brutal attack on the Kaufmanns, that, as demonstrated by his testimony and his "Judgment Day" email, he felt justified in condemning to death those whom he deemed morally unworthy, and that he was not, in the least, sorry for killing Georgette (or attempting to do the same to Daniel) even though he knew the "secular courts" would deem his acts illegal.  (SX92A).

For these additional reasons, and in light of the overall strength of the State's case, because Alvarez fails to show that the complained-of video moved an otherwise-acquitting jury to convict him on that basis, any error was harmless. *See Martinez v. State*, No. 05-18-01107-CR, 2020 WL 913857, at *7 -8

(Tex.App.–Dallas Feb. 26, 2020, pet. ref'd)(mem.op., not designated for publication)(though erroneously admitted under Rule 403, presence-of-other-guns evidence unconnected to crime was harmless where State had strong case and contested issue was party liability).

Alvarez's final issue should be overruled.

## **PRAYER**

WHEREFORE, the State prays that Alvarez's convictions and sentences be affirmed.

Respectfully submitted,


BILL D. HICKS
DISTRICT ATTORNEY
34th JUDICIAL DISTRICT

 /s/ Raquel López
RAQUEL LOPEZ
ASST. DISTRICT ATTORNEY
201 EL PASO COUNTY COURTHOUSE
500 E. SAN ANTONIO
EL PASO, TEXAS 79901
(915) 546-2059 ext. 3070

FAX (915) 533-5520
EMAIL Ra.Lopez@epcounty.com
SBN 24092721

ATTORNEYS FOR THE STATE

## **CERTIFICATE OF COMPLIANCE**

The undersigned does hereby certify that, based on the computer-processing

program used to prepare it, the foregoing document contains <u>14,993</u> words.

/s/ Raquel López
RAQUEL LOPEZ

## **CERTIFICATE OF SERVICE**

The undersigned does hereby certify that a copy of the above State's brief

was sent by email via the e-file system on October 28, 2024, to appellant's

attorney: Greg Anderson, at GregAndersonLawOffice@gmail.com.

/s/ Raquel López
RAQUEL LOPEZ

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Raquel Lopez on behalf of Raquel Lopez
Bar No. 24092721
Ra.Lopez@epcounty.com
Envelope ID: 93662951
Filing Code Description: Brief Not Requesting Oral Argument
Filing Description: The State's Reply Brief
Status as of 10/29/2024 9:40 AM MST

Associated Case Party: Joseph Alvarez

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Greg Anderson | | Gregandersonlawoffice@gmail.com | 10/28/2024 5:31:18 PM | SENT |

Associated Case Party: The State of Texas

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| El Paso County District Attorney's Office | | daappeals@epcounty.com | 10/28/2024 5:31:18 PM | SENT |